# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 2, 2009         Decided January 5, 2010

No. 09-5051

GHALEB NASSAR AL-BIHANI,
APPELLANT

v.

BARACK OBAMA, PRESIDENT OF THE UNITED STATES, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:05-cv-01312-RJL)

*Shereen J. Charlick* argued the cause for appellant. With her on the briefs were *Reuben Camper Cahn*, *Steven F. Hubachek*, and *Ellis M. Johnston*, *III*.

*Matthew M. Collette*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Ian Gershengorn*, Deputy Assistant Attorney General, and *Douglas N. Letter* and *Robert M. Loeb*, Attorneys. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

Before: BROWN and KAVANAUGH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* BROWN.

Concurring opinion filed by *Circuit Judge* BROWN.

Opinion concurring in part and concurring in the judgment filed by *Senior Circuit Judge* WILLIAMS.

BROWN, *Circuit Judge*:  Ghaleb Nassar Al-Bihani appeals the denial of his petition for a writ of habeas corpus and seeks reversal or remand.  He claims his detention is unauthorized by statute and the procedures of his habeas proceeding were constitutionally infirm.  We reject these claims and affirm the denial of his petition.

I

Al-Bihani, a Yemeni citizen, has been held at the U.S. naval base detention facility in Guantanamo Bay, Cuba since 2002.  He came to Guantanamo by a circuitous route.  It began in Saudi Arabia in the first half of 2001 when a local sheikh issued a religious challenge to Al-Bihani.  In response, Al-Bihani traveled through Pakistan to Afghanistan eager to defend the Taliban's Islamic state against the Northern Alliance.  Along the way, he stayed at what the government alleges were Al Qaeda–affiliated guesthouses; Al-Bihani only concedes they were affiliated with the Taliban.  During this transit period, he may also have received instruction at two Al Qaeda terrorist training camps, though Al-Bihani disputes this.  What he does not dispute is that he eventually accompanied and served a paramilitary group allied with the Taliban, known as the 55th Arab Brigade, which included Al Qaeda members

within its command structure and which fought on the front lines against the Northern Alliance. He worked as the brigade's cook and carried a brigade-issued weapon, but never fired it in combat. Combat, however—in the form of bombing by the U.S.-led Coalition that invaded Afghanistan in response to the attacks of September 11, 2001—forced the 55th to retreat from the front lines in October 2001. At the end of this protracted retreat, Al-Bihani and the rest of the brigade surrendered, under orders, to Northern Alliance forces, and they kept him in custody until his handover to U.S. Coalition forces in early 2002. The U.S. military sent Al-Bihani to Guantanamo for detention and interrogation.

After the Supreme Court held in *Rasul v. Bush*, 542 U.S. 466, 483–84 (2004), that the statutory habeas jurisdiction of federal courts extended to Guantanamo Bay, Al-Bihani filed a habeas petition with the U.S. District Court for the District of Columbia, challenging his detention under 28 U.S.C. § 2241(a). The district court stayed the petition until the Supreme Court in *Boumediene v. Bush*, 128 S. Ct. 2229 (2008), held that the section of the Military Commissions Act of 2006 (2006 MCA), Pub. L. No. 109-366, 120 Stat. 2600 (codified in part at 28 U.S.C. § 2241 & note), that withdrew jurisdiction from the courts to entertain habeas petitions filed by Guantanamo detainees was an unconstitutional suspension of the writ. 128 S. Ct. at 2274. *Boumediene* held that detainees were entitled to proceed with habeas challenges under procedures crafted to account for the special circumstances of wartime detention. *Id*. at 2276.

Soon after the *Boumediene* decision, the district court, acting with admirable dispatch, revived Al-Bihani's petition and convened counsel to discuss the process to be used. The district court finalized the procedure in a published case management order. *See Al-Bihani v. Bush* (CMO), 588 F. Supp.2d 19 (D.D.C. 2008) (case management order). The order established that the government had the burden of

proving the legality of Al-Bihani's detention by a preponderance of the evidence; it obligated the government to explain the legal basis for Al-Bihani's detention, to share all documents used in its factual return, and to turn over any exculpatory evidence found in preparation of its case. To Al-Bihani, the order afforded the opportunity to file a traverse and supplements to the traverse rebutting the government's factual return, to introduce new evidence, and to move for discovery upon a showing of good cause and the absence of undue burden on the government. The order reserved the district court's discretion, when appropriate, to adopt a rebuttable presumption in favor of the accuracy of the government's evidence and to admit relevant and material hearsay, the credibility and weight of which the opposing party could challenge. The order also scheduled status conferences to clarify any discovery and evidentiary issues with the government's factual return and to identify issues of law and fact prior to the habeas hearing where such issues would be contested. *See id.* at 20–21.

After the parties filed their cases in accordance with the case management order and the district court held a day and a half of hearings, the district court denied Al-Bihani's petition. Adopting a definition that allowed the government to detain anyone "who was part of or supporting Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against the United States or its coalition partners,"[1] the district court found Al-Bihani's actions met the standard. *See Al-Bihani v. Obama* (Mem. Op.), 594 F. Supp.2d 35, 38, 40 (D.D.C. 2009) (memorandum opinion). It cited as sufficiently credible the evidence—primarily drawn from

---

[1] This was the initial definition offered by the government as the controlling standard. In its filings before this court, the government modified the definition in its initial habeas return to replace the term "support" with "substantially supported." *See* Brief for Appellees at 21–22. The district court adopted the initial definition. *See* Mem. Op. at 38.

Al-Bihani's own admissions during interrogation—that Al-Bihani stayed at Al Qaeda–affiliated guesthouses and that he served in and retreated with the 55th Arab Brigade. *See id.* at 39–40. The district court declined to rely on evidence drawn from admissions—later recanted by Al-Bihani—that he attended Al Qaeda training camps on his way to the front lines. *See id.* at 39.

Al-Bihani appealed the district court's denial to this court under 28 U.S.C. § 2253(a), alleging numerous substantive and procedural defects with the order. We review the district court's findings of fact for clear error, *DeBerry v. Portuondo*, 403 F.3d 57, 66 (2d Cir. 2005), its habeas determination *de novo*, *id.*, and any challenged evidentiary rulings for abuse of discretion, *Al Odah v. United States*, 559 F.3d 539, 544 (D.C. Cir. 2009).

II

Al-Bihani's many arguments present this court with two overarching questions regarding the detainees at the Guantanamo Bay naval base. The first concerns whom the President can lawfully detain pursuant to statutes passed by Congress. The second asks what procedure is due to detainees challenging their detention in habeas corpus proceedings. The Supreme Court has provided scant guidance on these questions, consciously leaving the contours of the substantive and procedural law of detention open for lower courts to shape in a common law fashion. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 522 n.1 (2004) (plurality opinion of O'Connor, J.) ("The permissible bounds of the [enemy combatant] category will be defined by the lower courts as subsequent cases are presented to them."); *Boumediene*, 128 S. Ct. at 2276 ("We make no attempt to anticipate all of the evidentiary and access-to-counsel issues . . . and the other remaining questions [that] are within the expertise and

competence of the District Court to address in the first instance."). In this decision, we aim to narrow the legal uncertainty that clouds military detention.

A

Al-Bihani challenges the statutory legitimacy of his detention by advancing a number of arguments based upon the international laws of war. He first argues that relying on "support," or even "substantial support" of Al Qaeda or the Taliban as an independent basis for detention violates international law. As a result, such a standard should not be read into the ambiguous provisions of the Authorization for Use of Military Force (AUMF), Pub. L. No. 107-40, § 2(a), 115 Stat. 224, 224 (2001) (reprinted at 50 U.S.C. § 1541 note), the Act empowering the President to respond to the attacks of September 11, 2001. Al-Bihani interprets international law to mean anyone not belonging to an official state military is a civilian, and civilians, he says, must commit a direct hostile act, such as firing a weapon in combat, before they can be lawfully detained. Because Al-Bihani did not commit such an act, he reasons his detention is unlawful. Next, he argues the members of the 55th Arab Brigade were not subject to attack or detention by U.S. Coalition forces under the laws of co-belligerency because the 55th, although allied with the Taliban against the Northern Alliance, did not have the required opportunity to declare its neutrality in the fight against the United States. His third argument is that the conflict in which he was detained, an international war between the United States and Taliban-controlled Afghanistan, officially ended when the Taliban lost control of the Afghan government. Thus, absent a determination of future dangerousness, he must be released. *See* Geneva Convention Relative to the Treatment of Prisoners of War (Third Geneva Convention) art. 118, Aug. 12, 1949, 6 U.S.T. 3316, 75

U.N.T.S. 135. Lastly, Al-Bihani posits a type of "clean hands" theory by which any authority the government has to detain him is undermined by its failure to accord him the prisoner-of-war status to which he believes he is entitled by international law.

Before considering these arguments in detail, we note that all of them rely heavily on the premise that the war powers granted by the AUMF and other statutes are limited by the international laws of war. This premise is mistaken. There is no indication in the AUMF, the Detainee Treatment Act of 2005, Pub. L. No. 109-148, div. A, tit. X, 119 Stat. 2739, 2741–43, or the MCA of 2006 or 2009, that Congress intended the international laws of war to act as extra-textual limiting principles for the President's war powers under the AUMF. The international laws of war as a whole have not been implemented domestically by Congress and are therefore not a source of authority for U.S. courts. *See* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 111(3)–(4) (1987). Even assuming Congress had at some earlier point implemented the laws of war as domestic law through appropriate legislation, Congress had the power to authorize the President in the AUMF and other later statutes to exceed those bounds. *See id.* § 115(1)(a). Further weakening their relevance to this case, the international laws of war are not a fixed code. Their dictates and application to actual events are by nature contestable and fluid. *See id.* § 102 cmts. b & c (stating there is "no precise formula" to identify a practice as custom and that "[i]t is often difficult to determine when [a custom's] transformation into law has taken place"). Therefore, while the international laws of war are helpful to courts when identifying the general set of war powers to which the AUMF speaks, *see Hamdi*, 542 U.S. at 520, their lack of controlling legal force and firm definition render their use both inapposite and inadvisable when courts seek to determine the limits of the President's war powers.

Therefore, putting aside that we find Al-Bihani's reading of international law to be unpersuasive, we have no occasion here to quibble over the intricate application of vague treaty provisions and amorphous customary principles. The sources we look to for resolution of Al-Bihani's case are the sources courts always look to: the text of relevant statutes and controlling domestic caselaw.

Under those sources, Al-Bihani is lawfully detained whether the definition of a detainable person is, as the district court articulated it, "an individual who was part of or supporting Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against the United States or its coalition partners," or the modified definition offered by the government that requires that an individual "substantially support" enemy forces. The statutes authorizing the use of force and detention not only grant the government the power to craft a workable legal standard to identify individuals it can detain, but also cabin the application of these definitions. The AUMF authorizes the President to "use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons." AUMF § 2(a). The Supreme Court in *Hamdi* ruled that "necessary and appropriate force" includes the power to detain combatants subject to such force. 542 U.S. at 519. Congress, in the 2006 MCA, provided guidance on the class of persons subject to detention under the AUMF by defining "unlawful enemy combatants" who can be tried by military commission. 2006 MCA sec. 3, § 948a(1). The 2006 MCA authorized the trial of an individual who "engaged in hostilities or who has purposefully and materially supported hostilities against the United States or its co-belligerents who is not a lawful enemy combatant (including a person who is part of the Taliban, al Qaeda, or associated forces)." *Id.* § 948a(1)(A)(i). In 2009,

Congress enacted a new version of the MCA with a new definition that authorized the trial of "unprivileged enemy belligerents," a class of persons that includes those who "purposefully and materially supported hostilities against the United States or its coalition partners." Military Commissions Act of 2009 (2009 MCA) sec. 1802, §§ 948a(7), 948b(a), 948c, Pub. L. No. 111-84, tit. XVIII, 123 Stat. 2190, 2575–76. The provisions of the 2006 and 2009 MCAs are illuminating in this case because the government's detention authority logically covers a category of persons no narrower than is covered by its military commission authority. Detention authority in fact sweeps wider, also extending at least to traditional P.O.W.s, *see id.* § 948a(6), and arguably to other categories of persons. But for this case, it is enough to recognize that any person subject to a military commission trial is also subject to detention, and that category of persons includes those who are part of forces associated with Al Qaeda or the Taliban or those who purposefully and materially support such forces in hostilities against U.S. Coalition partners.

In light of these provisions of the 2006 and 2009 MCAs, the facts that were both found by the district court and offered by Al-Bihani in his traverse place Al-Bihani within the "part of" and "support" prongs of the relevant statutory definition. The district court found Al Qaeda members participated in the command structure of the 55th Arab Brigade, *see* Mem. Op. at 40, making the brigade an Al Qaeda–affiliated outfit, and it is unquestioned that the 55th fought alongside the Taliban while the Taliban was harboring Al Qaeda. Al-Bihani's evidence confirmed these points, establishing that the 55th "supported the Taliban against the Northern Alliance," a Coalition partner, and that the 55th was "aided, or even, at times, commanded, by al-Qaeda members." Brief for Petitioner-Appellant at 33. Al-Bihani's connections with the 55th therefore render him detainable. His

acknowledged actions—accompanying the brigade on the battlefield, carrying a brigade-issued weapon, cooking for the unit, and retreating and surrendering under brigade orders—strongly suggest, in the absence of an official membership card, that he was part of the 55th. Even assuming, as he argues, that he was a civilian "contractor" rendering services, *see id.* at 32, those services render Al-Bihani detainable under the "purposefully and materially supported" language of both versions of the MCA. That language constitutes a standard whose outer bounds are not readily identifiable. But wherever the outer bounds may lie, they clearly include traditional food operations essential to a fighting force and the carrying of arms. Viewed in full, the facts show Al-Bihani was part of and supported a group—prior to and after September 11—that was affiliated with Al Qaeda and Taliban forces and engaged in hostilities against a U.S. Coalition partner. Al-Bihani, therefore, falls squarely within the scope of the President's statutory detention powers.[2]

The government can also draw statutory authority to detain Al-Bihani directly from the language of the AUMF. The AUMF authorizes force against those who "harbored . . . organizations or persons" the President determines "planned, authorized, committed, or aided the terrorist attacks of September 11, 2001." AUMF § 2(a). It is not in dispute that Al Qaeda is the organization responsible for September 11 or that it was harbored by the Taliban in Afghanistan. It is also not in dispute that the 55th Arab Brigade defended the Taliban against the Northern Alliance's efforts to oust the regime from

---

[2] In reaching this conclusion, we need not rely on the evidence suggesting that Al-Bihani attended Al Qaeda training camps in Afghanistan and visited Al Qaeda guesthouses. We do note, however, that evidence supporting the military's reasonable belief of either of those two facts with respect to a non-citizen seized abroad during the ongoing war on terror would seem to overwhelmingly, if not definitively, justify the government's detention of such a non-citizen. *Cf.* NAT'L COMM'N ON TERRORIST ATTACKS UPON THE UNITED STATES, THE 9/11 COMMISSION REPORT 66–67.

power.  Drawing from these facts, it cannot be disputed that the actual and foreseeable result of the 55th's defense of the Taliban was the maintenance of Al Qaeda's safe haven in Afghanistan.  This result places the 55th within the AUMF's wide ambit as an organization that harbored Al Qaeda, making it subject to U.S. military force and its members and supporters—including Al-Bihani—eligible for detention.

Al-Bihani disagrees with this conclusion, arguing that the 55th Arab Brigade was not lawfully subject to attack and detention.  He points to the international laws of co-belligerency to demonstrate that the brigade should have been allowed the opportunity to remain neutral upon notice of a conflict between the United States and the Taliban.  We reiterate that international law, including the customary rules of co-belligerency, do not limit the President's detention power in this instance.  But even if Al-Bihani's argument were relevant to his detention and putting aside all the questions that applying such elaborate rules to this situation would raise, the laws of co-belligerency affording notice of war and the choice to remain neutral have only applied to nation states.  *See* 2 L. OPPENHEIM, INTERNATIONAL LAW: A TREATISE § 74 (1906). The 55th clearly was not a state, but rather an irregular fighting force present within the borders of Afghanistan at the sanction of the Taliban.  Any attempt to apply the rules of co-belligerency to such a force would be folly, akin to this court ascribing powers of national sovereignty to a local chapter of the Freemasons.

While we think the facts of this case show Al-Bihani was both part of and substantially supported enemy forces, we realize the picture may be less clear in other cases where facts may indicate only support, only membership, or neither.  We have no occasion here to explore the outer bounds of what constitutes sufficient support or indicia of membership to meet the detention standard.  We merely recognize that both prongs are valid criteria that are independently sufficient to satisfy the

standard.

With the government's detention authority established as an initial matter, we turn to the argument that Al-Bihani must now be released according to longstanding law of war principles because the conflict with the Taliban has allegedly ended. *See Hamdi*, 542 U.S. at 521. Al-Bihani offers the court a choice of numerous event dates—the day Afghans established a post-Taliban interim authority, the day the United States recognized that authority, the day Hamid Karzai was elected President—to mark the official end of the conflict. No matter which is chosen, each would dictate the release of Al-Bihani if we follow his reasoning. His argument fails on factual and practical grounds. First, it is not clear if Al-Bihani was captured in the conflict with the Taliban or with Al Qaeda; he does not argue that the conflict with Al Qaeda is over. Second, there are currently 34,800 U.S. troops and a total of 71,030 Coalition troops in Afghanistan, *see* N. Atl. Treaty Org. [NATO], *International Security Assistance Force and Afghan National Army Strength & Laydown*, at 2, Oct. 22, 2009, *available at* http://www.nato.int/ISAF/docu/epub/pdf/isaf_placemat.pdf, with tens of thousands more to be added soon. The principle Al-Bihani espouses—were it accurate—would make each successful campaign of a long war but a Pyrrhic prelude to defeat. The initial success of the United States and its Coalition partners in ousting the Taliban from the seat of government and establishing a young democracy would trigger an obligation to release Taliban fighters captured in earlier clashes. Thus, the victors would be commanded to constantly refresh the ranks of the fledgling democracy's most likely saboteurs.

In response to this commonsense observation, Al-Bihani contends the current hostilities are a different conflict, one against the Taliban reconstituted in a non-governmental form, and the government must prove that Al-Bihani would join this insurgency in order to continue to

hold him. But even the laws of war upon which he relies do not draw such fine distinctions. The Geneva Conventions require release and repatriation only at the "cessation of active hostilities." Third Geneva Convention art. 118. That the Conventions use the term "active hostilities" instead of the terms "conflict" or "state of war" found elsewhere in the document is significant. It serves to distinguish the physical violence of war from the official beginning and end of a conflict, because fighting does not necessarily track formal timelines. *See id.* art. 2 (provisions apply "even if the state of war is not recognized"), art. 118 (discussing the possibility of the cessation of active hostilities even in the absence of an agreement to cease hostilities). The Conventions, in short, codify what common sense tells us must be true: release is only required when the fighting stops.

Even so, we do not rest our resolution of this issue on international law or mere common sense. The determination of when hostilities have ceased is a political decision, and we defer to the Executive's opinion on the matter, at least in the absence of an authoritative congressional declaration purporting to terminate the war. *See Ludecke v. Watkins*, 335 U.S. 160, 168–70 & n.13 (1948) ("[T]ermination [of a state of war] is a political act."). Al-Bihani urges the court to ignore *Ludecke*'s controlling precedent because the President in that case had pronounced that a war was ongoing, whereas in this case the President has made no such pronouncement. We reject Al-Bihani's entreaty. A clear statement requirement is at odds with the wide deference the judiciary is obliged to give to the democratic branches with regard to questions concerning national security. In the absence of a determination by the political branches that hostilities in Afghanistan have ceased, Al-Bihani's continued detention is justified.

Al-Bihani also argues he should be released because the government's failure to accord him P.O.W. status violated international law and undermined its otherwise lawful

authority to detain him. Even assuming Al-Bihani is entitled to P.O.W. status, we find no controlling authority for this "clean hands" theory in statute or in caselaw. The AUMF, DTA, and MCA of 2006 and 2009 do not hinge the government's detention authority on proper identification of P.O.W.s or compliance with international law in general. In fact, the MCA of 2006, in a provision not altered by the MCA of 2009, explicitly precludes detainees from claiming the Geneva conventions—which include criteria to determine who is entitled to P.O.W. status—as a source of rights. *See* 2006 MCA sec. 5(a). And the citation Al-Bihani gives to support his theory is not controlling. The section of Justice Souter's separate opinion in *Hamdi* in which he discusses a clean hands theory was part of his dissent in that case. *See* 542 U.S. at 553 (Souter, J., concurring in part, dissenting in part, and concurring in the judgment) ("For me, it suffices that the Government has failed to justify [detention] in the absence of . . . a showing that the detention conforms to the laws of war . . . . [T]his disposition does not command a majority of the Court."). Moreover, Justice Souter's opinion fails to identify any other controlling authority that establishes or discusses this theory in any way. This leaves no foundation for Al-Bihani's clean hands argument, and it fails to persuade.

B

We now turn to Al-Bihani's procedural challenge. He claims the habeas process afforded him by the district court fell short of the requirements of the Suspension Clause and that his case should be remanded for rehearing in line with new, more protective procedures. The Supreme Court in *Boumediene* held detainees are entitled to the "fundamental procedural protections of habeas corpus." 128 S. Ct. at 2277. The *Boumediene* Court refrained from identifying the full list of procedures that are fundamental, but it did say that a petitioner

is entitled to "a meaningful opportunity to demonstrate that he is being held pursuant to the erroneous application or interpretation of relevant law," and that "the habeas court must have the power to order the conditional release" of the petitioner. *Id.* at 2266. Meaningful review in this context requires that a court have "some authority to assess the sufficiency of the Government's evidence against the detainee" and to "admit and consider relevant exculpatory evidence" that may be added to the record by petitioners during review. *Id.* at 2270.

Drawing upon *Boumediene*'s holding, Al-Bihani challenges numerous aspects of the habeas procedure devised by the district court. He claims the district court erred by: (1) adopting a preponderance of the evidence standard of proof; (2) shifting the burden to him to prove the unlawfulness of his detention; (3) neglecting to hold a separate evidentiary hearing; (4) admitting hearsay evidence; (5) presuming the accuracy of the government's evidence; (6) requiring him to explain why his discovery request would not unduly burden the government; and (7) denying all but one of his discovery requests. In support of these claims, Al-Bihani cites statutes prescribing habeas procedure for review of federal and state court convictions and analogizes to a number of cases concerning review of detentions related to criminal prosecutions. Brief for Petitioner-Appellant at 48–49. By referencing these sources, Al-Bihani traces the district court's supposed errors to its failure to accord him procedural parity with safeguards found in review of criminal proceedings.

Al-Bihani's argument clearly demonstrates error, but that error is his own. Habeas review for Guantanamo detainees need not match the procedures developed by Congress and the courts specifically for habeas challenges to criminal convictions. *Boumediene*'s holding explicitly stated that habeas procedures for detainees "need not resemble a criminal trial," 128 S. Ct. at 2269. It instead invited

"innovation" of habeas procedure by lower courts, granting leeway for "[c]ertain accommodations [to] be made to reduce the burden habeas corpus proceedings will place on the military." *Id.* at 2276. *Boumediene*'s holding therefore places Al-Bihani's procedural argument on shaky ground. The Suspension Clause protects only the fundamental character of habeas proceedings, and any argument equating that fundamental character with all the accoutrements of habeas for domestic criminal defendants is highly suspect.

In considering Al-Bihani's argument, we recognize that the Great Writ is not a static institution and it did not begin its life looking like it does today. Rather, like a tree extending its branches, habeas has grown over a long history to develop various procedures applicable to various circumstances of detention. *See id.* ("[Past cases] stand for the proposition that the Suspension Clause does not resist innovation in the field of habeas corpus."); *Developments in the Law—Federal Habeas Corpus*, 83 HARV. L. REV. 1038, 1269 (1970) ("It is then the nature of the writ that it grow and adapt to new conditions . . . through a combination of statutory and judicial innovation."). For example, federal habeas review of criminal prosecutions at common law began as a cursory review of the legitimacy of a court's jurisdiction. *See United States v. Hayman*, 342 U.S. 205, 211 (1952). Congress expanded this review authority in 1867 to reach a determination of actual facts, *id.*, likely motivated by a desire to rein in what it viewed as recalcitrant law enforcement in the former Confederate states during Reconstruction. *See* Evan Tsen Lee, *The Theories of Federal Habeas Corpus*, 72 WASH. U. L.Q. 151, 182 (1994). As the twentieth century progressed, the protections and rules of criminal habeas expanded further to account for a growing number of recognized constitutional and statutory rights and to manage the sheer number of petitions coursing through the federal courts. *See, e.g.*, 28 U.S.C. § 2246 (prescribing a right for petitioner to propound interrogatories or file answering

affidavits); 18 U.S.C. § 3771(b)(2) (guaranteeing certain rights to crime victims in habeas proceedings); 28 U.S.C. § 2255 (providing alternate forum to streamline habeas petition review); Act of Sept. 28, 1976, Pub. L. No. 94-426, 90 Stat. 1334 (adopting rules governing § 2254 and § 2255 proceedings); *Jackson v. Virginia*, 443 U.S. 307, 321–24 (1979) (holding that federal court reviewing state court conviction must determine whether sufficient evidence existed to justify conviction beyond a reasonable doubt); *Holiday v. Johnston*, 313 U.S. 342, 352–54 (1941) (requiring review of habeas petitions be conducted by judges). Rules governing habeas petitions apart from the criminal sphere—such as those challenging post-removal-period detention in the immigration context, *see, e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 701 (2001) (establishing scheme of presumptions and burden shifting), and those filed pursuant to the Force Act of 1833, ch. 57, § 7, 4 Stat. 632, 634–35 (creating additional penalties for defying court's jurisdiction to review such petitions)—developed separately. This brief account of habeas' evolving nature serves to make clear that, in the shadow of *Boumediene*, courts are neither bound by the procedural limits created for other detention contexts nor obliged to use them as baselines from which any departures must be justified. Detention of aliens outside the sovereign territory of the United States during wartime is a different and peculiar circumstance, and the appropriate habeas procedures cannot be conceived of as mere extensions of an existing doctrine. Rather, those procedures are a whole new branch of the tree.

Al-Bihani, however, argues his case does not rest on that branch. He points to one of the seven concurring opinions in *Al-Marri v. Pucciarelli*, 534 F.3d 213, 269 (4th Cir. 2008) (Traxler, J., concurring in the judgment), to support his contention that the Supreme Court did not authorize less demanding procedures for a case like his. *See* Brief for Petitioner-Appellant at 50. Judge Traxler's opinion reasoned

the *Hamdi* Court blessed lower procedural standards only upon a showing of undue hardship by the government, but such hardship was especially clear when a petitioner was seized on a foreign battlefield where the prospect of high evidentiary standards might interfere with military operations. *See Al-Marri*, 534 F.3d at 270–71. Because the petitioner in *Al-Marri* was seized by federal law enforcement in Illinois, Judge Traxler concluded that as a general rule he was "entitled to the normal due process protections available to all within this country," absent a satisfactory showing by the government. *Id.* at 273. We do not express an opinion on whether or when different habeas procedures are appropriate for petitioners seized domestically pursuant to the AUMF; those questions are for another case. It is enough for us to point out that Judge Traxler's opinion is of no help to Al-Bihani; he falls squarely in the category of petitioners that Judge Traxler and the Supreme Court in *Hamdi* deemed deserving of leaner procedures.[3]

Unlike either Hamdi or Al-Marri, Al-Bihani is a non-citizen who was seized in a foreign country. Requiring highly protective procedures at the tail end of the detention process for detainees like Al-Bihani would have systemic effects on the military's entire approach to war. From the moment a shot is fired, to battlefield capture, up to a detainee's day in court, military operations would be compromised as the government strove to satisfy evidentiary standards in anticipation of habeas litigation. Al-Bihani suggests no such danger is posed in his case because the evidence presented in the government's return consisted mainly of records of interrogations that took place at Guantanamo and not of evidence procured from the battlefield. *See* Brief for

---

[3] Both *Hamdi* and *Al-Marri* involved American citizens or legal residents; the procedures to which Americans are entitled are likely greater than the procedures to which non-citizens seized abroad during the war on terror are entitled.

Petitioner-Appellant at 49–50. Logically, however, had the district court imposed stringent standards of evidence in the first instance, the government may well have been obligated to go beyond Al-Bihani's interrogation records and into the battlefield to present a case that met its burden. That the district court's tailored procedure prevented such a scenario cannot possibly make the procedure constitutionally infirm.

With Al-Bihani's limited procedural entitlement established as a general matter, we turn to the specific procedural claims warranting serious consideration. The question of what standard of proof is due in a habeas proceeding like Al-Bihani's has not been answered by the Supreme Court. *See Boumediene*, 128 S. Ct. at 2271 ("The extent of the showing required of the Government in these cases is a matter to be determined."). Attempting to fill this void, Al-Bihani argues the prospect of indefinite detention in this unconventional war augurs for a reasonable doubt standard or, in the alternative, at least a clear and convincing standard. Brief for Petitioner-Appellant at 48. The government disagrees, arguing that *Hamdi*'s plurality opinion indirectly endorsed a preponderance standard when it suggested due process requirements may have been satisfied by a military tribunal, the regulations of which adopt a preponderance standard. Brief for Appellees at 55–56, *citing* U.S. Dep'ts of the Army, the Navy, the Air Force, and the Marine Corps, Army Regulation 190-8, Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees § 1-6(e)(9) (Oct. 1, 1997), *available at* http://www.au.af.mil/au/awc/ awcgate/law/ar190-8.pdf.

We believe the government's argument stands on more solid ground. In addition to the *Hamdi* plurality's approving treatment of military tribunal procedure, it also described as constitutionally adequate—even for the detention of U.S. citizens—a "burden-shifting scheme" in which the government need only present "credible evidence that the

habeas petitioner meets the enemy-combatant criteria" before "the onus could shift to the petitioner to rebut that evidence with more persuasive evidence that he falls outside the criteria." *Hamdi*, 542 U.S. at 533–34. That description mirrors a preponderance standard. We emphasize our opinion does not endeavor to identify what standard would represent the minimum required by the Constitution.[4] Our narrow charge is to determine whether a preponderance standard is unconstitutional. Absent more specific and relevant guidance, we find no indication that it is.

As already discussed, traditional habeas review did not entail review of factual findings, particularly in the military context. *See In re Yamashita*, 327 U.S. 1, 8 (1946) ("If the military tribunals have lawful authority to hear, decide and condemn, their action is not subject to judicial review merely because they have made a wrong decision on disputed facts."). Where factual review has been authorized, the burden in some domestic circumstances has been placed *on the petitioner* to prove his case under a clear and convincing standard. *See* 28 U.S.C. § 2254(e)(1) (regulating federal review of state court factual findings). If it is constitutionally permissible to place that higher burden on a citizen petitioner in a routine case, it follows a priori that placing a lower burden on the government defending a wartime detention—where national security interests are at their zenith and the rights of the alien petitioner at their nadir—is also permissible.

We find Al-Bihani's hearsay challenges to be similarly unavailing. Al-Bihani claims that government reports of his interrogation answers—which made up the majority, if not all,

---

[4] In particular, we need not address whether a some evidence, reasonable suspicion, or probable cause standard of proof could constitutionally suffice for preventative detention of non-citizens seized abroad who are suspected of being terrorist threats to the United States. *See Zadvydas*, 533 U.S. at 696; *cf.* Anti-terrorism, Crime and Security Act, 2001, c. 24, §§ 21, 23 (Eng.) (adopting a reasonable suspicion standard in Britain; later overturned as inconsistent with European Union law).

of the evidence on which the district court relied—and other informational documents were hearsay improperly admitted absent an examination of reliability and necessity. Brief for Petitioner-Appellant at 47, 50–52. He contends, in fact, that government reports of his interrogation answers were "*double* hearsay" because his answers were first translated by an interpreter and then written down by an interrogator. Petitioner-Appellant Rule 28(j) Letter, Sept. 28, 2009. We first note that Al-Bihani's interrogation answers themselves were not hearsay; they were instead party-opponent admissions that would have been admitted in any U.S. court. *See* FED. R. EVID. 801(d)(2)(A). That they were translated does not affect their status. *See United States v. Da Silva*, 725 F.2d 828, 831–32 (2d Cir. 1983) (holding that government employee translation of defendant's statement was not hearsay). However, that the otherwise admissible answers were relayed through an interrogator's account does introduce a level of technical hearsay because the interrogator is a third party unavailable for cross examination. Other information, such as a diagram of Al Qaeda's leadership structure, was also hearsay.

But that such evidence was hearsay does not automatically invalidate its admission—it only begins our inquiry. We observe Al-Bihani cannot make the traditional objection based on the Confrontation Clause of the Sixth Amendment. This is so because the Confrontation Clause applies only in criminal prosecutions, *see* U.S. CONST. amend. VI, and is not directly relevant to the habeas setting, *cf.* 28 U.S.C. § 2246 (granting discretion to habeas judge to admit affidavits into evidence). The Confrontation Clause seeks to ensure the reliability of evidence, but it also seeks to eliminate the ephemeral perception of unfairness associated with the use of hearsay evidence. *See Coy v. Iowa*, 487 U.S. 1012, 1017–19 (1988) ("The Sixth Amendment's guarantee of face-to-face encounter . . . serves ends related both to

appearances and to reality . . . [and] contributes to . . . the perception as well as the reality of fairness."). Al-Bihani, however, does not enjoy a right to the psychic value of excluding hearsay and whatever right he has is not an independent procedural entitlement. Rather, it operates only to the extent that it provides the baseline level of evidentiary reliability necessary for the "meaningful" habeas proceeding *Boumediene* requires under the Suspension Clause. *See* 128 S. Ct. at 2266.

Therefore, the question a habeas court must ask when presented with hearsay is not whether it is admissible—it is always admissible—but what probative weight to ascribe to whatever indicia of reliability it exhibits. This approach is evident in the relevant caselaw. *Boumediene* did not say exactly how a habeas court should treat hearsay, but it broadly required that a court be able to "assess the sufficiency of the Government's evidence." *Id.* at 2270. In *Hamdi*, the Supreme Court said hearsay "may need to be accepted as the most reliable available evidence" as long as the petitioner is given the opportunity to rebut that evidence. *See* 542 U.S. at 533–34. *Hamdi* pointed to a declaration from a government official describing his expertise regarding the facts of the case as an example of reliable hearsay. *Id.* at 538. And a panel of this court in the related context of DTA review did not reject hearsay evidence as inadmissible, but rather considered it and deemed it insufficient to support detention because the panel could not "assess the reliability" of its "bare assertions" in the absence of contextual information. *Parhat v. Gates*, 532 F.3d 834, 847 (D.C. Cir. 2008).

A procedure that seeks to determine hearsay's reliability instead of its mere admissibility comports not only with the requirements of this novel circumstance, but also with the reality that district judges are experienced and sophisticated fact finders. Their eyes need not be protected from unreliable information in the manner the Federal Rules of

Evidence aim to shield the eyes of impressionable juries. *See* FED. R. EVID. 103(c) (requiring courts to "prevent inadmissible evidence from being suggested to the jury by any means"); JAMES BRADLEY THAYER, A PRELIMINARY TREATISE ON EVIDENCE AT THE COMMON LAW 266 (1898) (describing the law of evidence as "the child of the jury system" that excludes probative evidence because of possible adverse effects on a lay jury). Where the touchstone of a proceeding is "meaningfulness," empowering a district court to review and assess all evidence from both sides is a logical process. It is one that bolsters the traditional power of the habeas court to "cut[] through all forms and go[] to the very tissue of the structure" of a proceeding and "look facts in the face." *Frank v. Mangum*, 237 U.S. 309, 346, 349 (1915) (Holmes, J., dissenting). The habeas judge is not asked, as he would be in a trial, to administrate a complicated clash of adversarial viewpoints to synthesize a process-dependent form of Hegelian legal truth. *See Blakely v. Washington*, 542 U.S. 296, 313 (2004) ("[T]he Framers' paradigm for criminal justice [was] not the civil-law ideal of administrative perfection, but the common-law ideal of limited state power accomplished by strict division of authority between judge and jury."). Rather, in a detainee case, the judge acts as a neutral decisionmaker charged with seizing the actual truth of a simple, binary question: is detention lawful? This is why the one constant in the history of habeas has never been a certain set of procedures, but rather the independent power of a judge to assess the actions of the Executive. This primacy of independence over process is at the center of the *Boumediene* opinion, which eschews prescribing a detailed procedural regime in favor of issuing a spare but momentous guarantee that a "judicial officer must have adequate authority to make a determination in light of the relevant law and facts." *Boumediene*, 128 S. Ct. at 2271; *cf. id.* at 2270 ("Even when the procedures authorizing detention are structurally sound, the

Suspension Clause remains applicable and the writ relevant."").

In Al-Bihani's case, the district court clearly reserved that authority in its process and assessed the hearsay evidence's reliability as required by the Supreme Court. First, the district court retained the authority to assess the weight of the evidence. *See* CMO at 21 ("The Government bears the ultimate burden of persuasion . . . [and t]he Court will determine, as to any evidence introduced by the Government, whether a presumption of accuracy and/or authenticity should be accorded."); Mem. Op. at 39 (judging admissions presented by government to be "credible and consistent"). Second, the district court had ample contextual information about evidence in the government's factual return to determine what weight to give various pieces of evidence. *See* Government's Classified Factual Return (Nov. 21, 2008). Third, the district court afforded Al-Bihani the opportunity in a traverse to rebut the evidence and to attack its credibility. *See* CMO at 21. Further, Al-Bihani did not contest the truth of the majority of his admissions upon which the district court relied, enhancing the reliability of those reports. We therefore find that the district court did not improperly admit hearsay evidence.

The rest of Al-Bihani's procedural claims can be disposed of without extended discussion. His claim that the burden of proof was placed on him is based on a strained reading of the hearing transcript that twists and magnifies questions asked by the judge. This claim has no merit and we need not consider it further. Likewise, Al-Bihani's claim that an evidentiary hearing was denied to him in violation of his right to a hearing is groundless. First, while courts reviewing state or federal court decisions have the discretion to grant fact hearings upon a proper showing by a petitioner, *see* 28 U.S.C. § 2254(e)(2); *Newfield v. United States*, 565 F.2d 203, 207 (2d Cir. 1977) (explaining that courts retain discretion under 28 U.S.C. § 2255 to grant fact hearings), Al-Bihani cites no authority that a petitioner in his position is entitled to such a

hearing as of right. Second, it is clear from the CMO and the transcript of the full habeas hearing that the district court did hear the facts of Al-Bihani's case and provided ample opportunity in conference and in a hearing for the parties to air concerns over evidence. *See* CMO at 20–21; Classified Hearing Transcript, P.M. Session (Jan. 15, 2009). To the extent that Al-Bihani possesses any right to a hearing to develop facts or argue evidentiary issues, it was satisfied by the district court's procedure.

Finally, regarding Al-Bihani's challenge to the discovery procedures adopted by the district court and to the denial of most of his discovery requests, we are inclined to find the procedures were permissible and the court's denial was not an abuse of discretion. However, we need not reach these issues. Even assuming error, the errors were harmless because discovery would not have changed the outcome of the case. None of the discovery requests that were denied would have had any impact on the factual basis on which the district court found Al-Bihani to be properly detained. All of the discovery requests pertained to the disputed facts surrounding whether Al-Bihani attended Al Qaeda training camps. The district court assiduously avoided those facts in its decision. *See* Mem. Op. at 39.

III

Al-Bihani's detention is authorized by statute and there was no constitutional defect in the district court's habeas procedure that would have affected the outcome of the proceeding. For these reasons, the order of the district court denying Al-Bihani's petition for a writ of habeas corpus is

*Affirmed.*

BROWN, *Circuit Judge*, concurring:    The Supreme Court in *Boumediene* and *Hamdi* charged this court and others with the unprecedented task of developing rules to review the propriety of military actions during a time of war, relying on common law tools.    We are fortunate this case does not require us to demarcate the law's full substantive and procedural dimensions.    But as other more difficult cases arise, it is important to ask whether a court-driven process is best suited to protecting both the rights of petitioners and the safety of our nation.    The common law process depends on incrementalism and eventual correction, and it is most effective where there are a significant number of cases brought before a large set of courts, which in turn enjoy the luxury of time to work the doctrine supple.    None of those factors exist in the Guantanamo context.    The number of Guantanamo detainees is limited and the circumstances of their confinement are unique.    The petitions they file, as the *Boumediene* Court counseled, are funneled through one federal district court and one appellate court.    *See Boumediene*, 128 S. Ct. at 2276. And, in the midst of an ongoing war, time to entertain a process of literal trial and error is not a luxury we have.

While the common law process presents these difficulties, it is important to note that the Supreme Court has not foreclosed Congress from establishing new habeas standards in line with its *Boumediene* opinion.    Having been repeatedly rebuffed, *see id.* at 2240 (holding that the DTA's procedures were an inadequate substitute for habeas and that the MCA therefore operated as an unconstitutional suspension of the writ); *Hamdan v. Rumsfeld*, 548 U.S. 557, 576–77 (2006) (holding that the DTA's withdrawal of federal habeas jurisdiction did not apply to petitions pending at the time of the DTA's enactment), Congress may understandably be reluctant to return to this arena to craft appropriate habeas standards as it has done for other habeas contexts in the past.    But the circumstances that frustrate the judicial process are the same

ones that make this situation particularly ripe for Congress to intervene pursuant to its policy expertise, democratic legitimacy, and oath to uphold and defend the Constitution. These cases present hard questions and hard choices, ones best faced directly.  Judicial review, however, is just that: *re*-view, an indirect and necessarily backward looking process.  And looking backward may not be enough in this new war.  The saying that generals always fight the last war is familiar, but familiarity does not dull the maxim's sober warning.  In identifying the shape of the law in response to the challenge of the current war, it is incumbent on the President, Congress, and the courts to realize that the saying's principle applies to us as well.  Both the rule of law and the nation's safety will benefit from an honest assessment of the new challenges we face, one that will produce an appropriately calibrated response.

Absent such action, much of what our Constitution requires for this context remains unsettled.  In this case, I remain mindful that the conflict in which Al-Bihani was captured was only one phase of hostilities between the United States and Islamic extremists.  The legal issues presented by our nation's fight with this enemy have been numerous, difficult, and to a large extent novel.  What drives these issues is the unconventional nature of our enemy: they are neither soldiers nor mere criminals, claim no national affiliation, and adopt long-term strategies and asymmetric tactics that exploit the rules of open societies without respect or reciprocity.

War is a challenge to law, and the law must adjust.  It must recognize that the old wineskins of international law, domestic criminal procedure, or other prior frameworks are ill-suited to the bitter wine of this new warfare.  We can no longer afford diffidence.  This war has placed us not just at, but already past the leading edge of a new and frightening paradigm, one that demands new rules be written.  Falling back on the comfort of prior practices supplies only illusory comfort.

WILLIAMS, *Senior Circuit Judge*, concurring in part and concurring in the judgment:  I agree with the majority's decision to affirm the district court's denial of Al Bihani's petition for a writ of habeas corpus.  I take a slightly different view of the central substantive issue in this case, and a significantly different view as to the necessity of reaching any of Al Bihani's procedural arguments.  For purposes of both my analysis and the majority's, the petitioner has conceded facts that render his detention lawful—thereby obviating any need to discuss the constitutionality of the district court's factfinding process.

\* \* \*

The petitioner's detention is legally permissible by virtue of facts that he himself has conceded.

He argues that he cannot be detained on the basis of his relationship with the 55th Brigade, for two reasons.  First, Al Bihani says, the Authorization for the Use of Military Force, Pub. L. 107-40 § 2(a) (2001) ("AUMF")—properly interpreted in light of applicable law-of-war principles— cannot be read to have authorized the U.S. government to conduct hostilities against the 55th Brigade.   Second, even if the 55th Brigade were the kind of organization targeted by the AUMF, he himself was not a part of the 55th Brigade, nor was his involvement with the unit enough to subject him to the lawful exercise of U.S. force.  Neither argument is persuasive.

The AUMF authorizes the President

to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future

acts of international terrorism against the United States by such nations, organizations or persons.

Pub. L. 107-40 § 2(a). Al Bihani acknowledges that both before and after 9/11, the 55th Brigade fought alongside the Taliban in Afghanistan in its fight against the Northern Alliance, Petitioner-Appellant's Unclassified Br. at 3-4, 33, and he cannot reasonably dispute that the Taliban "harbored" al Qaeda, which committed the 9/11 attacks, see *Boumediene v. Bush*, 128 S.Ct. 2229, 2241 (2008).

Noting, however, that under *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), the laws of war have—even in the government's view—a role to play in the interpretation of the AUMF's grant of authority, Appellees' Unclassified Br. at 23 (citing 542 U.S. at 521), Al Bihani says that under recognized principles of "co-belligerency" and the law of neutrality the United States would not have been permitted in the weeks after 9/11 to take hostile action against the 55th Brigade—which had conducted hostilities against a soon-to-be U.S. ally, the Northern Alliance, but not against the United States itself. In support of this position he cites a number of authorities suggesting that pursuant to the laws of war, a state's merely being an ally of a party to a conflict does not, without more, allow that state to take aggressive action against its ally's adverse parties. Unclassified Reply Br. at 12 (citing inter alia *Parry and Grant Encyclopaedic Dictionary of International Law* 84 (John P. Grant & J. Craig Barker eds., 2d ed. 2004)).

But the AUMF clearly authorized the President to attack the 55th Brigade. By its terms, the AUMF allows force against "organizations" that "harbored" those who were responsible for the 9/11 attacks. The 55th Brigade fought to preserve the Taliban regime in Afghanistan even as the Taliban was harboring al Qaeda in Afghanistan. This makes

the 55th Brigade, itself, an organization that "harbored" al Qaeda within the meaning of the AUMF.

No contrary interpretation of the AUMF is plausible. If the AUMF did *not* authorize U.S. force against an organization fighting in Afghanistan to stabilize and protect the Taliban's power after 9/11, then the American military campaign that started on October 7, 2001, was illegal—under *domestic* law—to the extent that it targeted not just Taliban forces fighting the Northern Alliance, but also 55th Brigade forces fighting with the Taliban against the Northern Alliance. Whatever the appropriate role of the laws of war in determining what powers the President derived from the AUMF, it cannot be to render unlawful the President's use of force in Afghanistan in the fall of 2001—which the Supreme Court has repeatedly acknowledged was permitted under the AUMF. See *Boumediene*, 128 S.Ct. at 2240-41. Under the best reading of the AUMF, then, Congress authorized that military campaign, aimed at removing the Taliban from the seat of government and minimizing its ongoing influence in Afghanistan, including the attacks on ancillary forces aiding the Taliban.

Because the 55th Brigade was properly the target of U.S. force in Afghanistan pursuant to the AUMF, it follows that members of the 55th Brigade taken into custody on the battlefield in Afghanistan in the fall of 2001 may be detained "for the duration of the particular conflict in which they were captured." See *id*. at 2241. In addition to detention based on a person's having been "part of" an AUMF-targeted organization, the government asserts that Congress authorized force against, and therefore detention of, someone who provided "substantial support" to such a group. Appellees' Unclassified Br. at 16.

Al Bihani argues, by contrast, that he was not a *part of* the 55th Brigade at all, but merely "a cook's assistant . . . near the front lines." Petitioner-Appellant's Unclassified Br. at 31. To be sure, the people he was cooking for were the members of the 55th Brigade, as his counsel acknowledged at oral argument. Oral Argument Tr. at 4 (Oct. 2, 2009) (referencing "the brigade for which he cooked"). Al Bihani maintains, though, that notwithstanding his cooking, and his having been provided a weapon, Petitioner-Appellant's Unclassified Br. at 4, he was effectively a "civilian contractor" rather than a bona fide member of the brigade, *id.* at 32. In support of this contention, he cites principally a document produced by the International Committee of the Red Cross (ICRC), entitled *Interpretive Guidance on the Notion of Direct Participation in Hostilities Under International Humanitarian Law.* That work, in his view, says that "individuals who accompany . . . armed forces and provide food" are properly viewed as civilians. Unclassified Reply Br. at 17. As a result, such food-providers can't permissibly be detained unless they themselves take hostile acts directly against their would-be detainers. *Id.*

The question whether a person was a "part of" an informal, non-state military organization like the 55th Brigade overlaps significantly with the question whether that person "supported" or indeed "substantially" or "materially" supported the organization. Both these terms are highly elastic, ranging from core membership and support to vague affiliation and cheerleading. But whatever their range, it seems hard to imagine how someone could be shown to be a member of such a group (for purposes of detention under the AUMF) without evidence that he also significantly supported it (for those purposes).

Regardless, however, of whether the operative inquiry probes membership in the unit, or support of the unit, or

substantial or material support of the unit, or some combination of these considerations, Al Bihani's involvement with the 55th Brigade—cooking for and carrying arms provided by the 55th Brigade, and doing so near the front lines of hostilities between the Taliban and the Northern Alliance—was ample to make him properly subject to U.S. force directed at the 55th Brigade pursuant to the AUMF. Purely on the basis of these activities, he was sufficiently enmeshed with the brigade to fall into the category of persons whom the AUMF allowed the U.S. military to target.[1] The alternative conclusion—which would have it that the President was authorized to use force against the fighting members of the 55th Brigade on the front lines in northern Afghanistan, but not against the armed people who enabled them to fight—is senseless. Because Al Bihani was effectively part of the 55th Brigade, and a sufficient supporter of same, his detention for the duration of the hostilities in which he was captured is lawful. See *Boumediene*, 128 S.Ct.

---

[1] While Al Bihani's concessions put him squarely among persons who may be lawfully detained, he has *not* in fact conceded that the 55th Brigade was commanded by Al Qaeda personnel. See Maj. Op. at 9 (quoting Al Bihani's brief for the proposition that the 55th was "'aided, or even, at times, commanded, by al-Qaeda members.'"). The phrase is in fact quite clearly part of a contingent argument ("Even if I lose on proposition A, I win on proposition B."): "Rather, the 55th, whether it was aided, or even, at times, commanded, by al-Qaeda members, was focused in its mission to fight frontal military operations against the Northern Alliance." Petitioner-Appellant's Unclassified Br. at 33.

at 2241 (citing *Hamdi*, opinions of O'Connor, J., and Thomas, J.).

The ICRC document does not alter this analysis. The work itself explicitly disclaims that it should be read to have the force of law. "[W]hile reflecting the ICRC's views," the authors write, "the Interpretive Guidance is not and cannot be a text of a legally binding nature." *Interpretive Guidance* 6. Even to the extent that Al Bihani's reading of the Guidance is correct, then, the best he can do is suggest that we should follow it on the basis of its persuasive force. As against the binding language of the AUMF and its necessary implications, however, that force is insubstantial.

Within the portion of the opinion addressing the petitioner's substantive argument that his activities in Afghanistan do not put him in the class of people whom the President may detain pursuant to the AUMF, the majority unnecessarily addresses a number of other points. Most notable is the paragraph that begins "Before considering these arguments in detail," and that reaches the conclusion that "the premise that the war powers granted by the AUMF and other statutes are limited by the international laws of war . . . is mistaken." See Maj. Op. at 6-7. The paragraph appears hard to square with the approach that the Supreme Court took in *Hamdi*. See 542 U.S. at 521 (O'Connor, J.) (plurality opinion) ("[W]e understand Congress' grant of authority for the use of 'necessary and appropriate force' to include the authority to detain for the duration of the relevant conflict, and our understanding is based on longstanding law-of-war principles."); *id*. at 548-49 (Souter, J., opinion concurring in part and dissenting in part) (advocating a more substantial role for the laws of war in interpretations of the President's authority under the AUMF). In any event, there is no need for the court's pronouncements, divorced from application to any particular argument. Curiously, the majority's dictum goes

well beyond what even the *government* has argued in this case. See Appellees' Unclassified Br. at 23 ("The authority conferred by the AUMF is informed by the laws of war.").

\*    \*    \*

Because the petitioner's detention is lawful by virtue of facts that he has conceded—a conclusion that the majority seems not to dispute—the majority's analysis of the constitutionality of the *procedures* the district court used (i.e., Maj. Op., Section II B) is unnecessary. Nothing in this case turns on the questions whether "preponderance of the evidence" is a constitutionally permissible standard of proof in Guantanamo detainees' habeas proceedings, whether the district court's approach to the admission of hearsay evidence is consistent with the minimum requirements of the Suspension Clause as the Supreme Court construed it in *Boumediene*, 128 S.Ct. 2229, or whether petitioners in Al Bihani's circumstance do or don't enjoy only a "limited procedural entitlement . . . as a general matter," Maj. Op. at 19. These matters are analytically irrelevant to the outcome of this appeal, since the facts that Al Bihani says are correct readily yield a ruling that his detention is legally permissible.

\*    \*    \*

I join the majority's opinion to the extent it is consistent with the preceding arguments and observations.