# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued March 10, 2011           Decided May 27, 2011

No. 10-5172

MASAAB OMAR AL-MADHWANI, DETAINEE,
CAMP DELTA AND ALI OMAR MADHWANI,
AS NEXT FRIEND OF MUSSAB OMAR AL-MADHWANI,
APPELLANTS

v.

BARACK OBAMA, PRESIDENT OF THE UNITED STATES ET AL.,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:04-cv-01194)

---

*Darold W. Killmer* argued the cause for the appellants. *Mari Newman* was on brief. *Sara J. Rich* entered an appearance.

*August E. Flentje*, Attorney, United States Department of Justice, argued the cause for the appellees. *Robert M. Loeb*, Attorney, was on brief.

Before: GINSBURG, HENDERSON and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Musa'ab Omar al-Madhwani (Madhwani), a Yemeni detainee at Guantanamo Bay, Cuba, appeals the district court's denial of his

petition for a writ of habeas corpus. Madhwani claims that there was insufficient evidence to find that he was "part of" al-Qaida and argues further that the district court relied on evidence outside the record, abused its discretion in denying additional discovery and committed various legal errors. Because we find no merit in Madhwani's evidentiary and legal arguments, we affirm the district court.

**I.**

In early summer 2001, Madhwani met two men in a coffee shop somewhere in Yemen. The two spoke to him about the "new Islamic state" in Afghanistan. Merits Hearing Tr. at 62, 69, *Anam v. Obama*, C.A. No. 04-1194 (D.D.C. Oct. 27, 2009) (Tr. 10/27). One of them suggested to Madhwani—a recent high school graduate who was unemployed—that he go to Afghanistan to "witness the situation" for himself. *Id.* at 71–72. Madhwani accepted a plane ticket and a small sum of money from the man and left Yemen in August 2001. The stated purpose of his trip, according to Madhwani, was "adventure" and "to see what things are like in Afghanistan." *Id.* at 73. Once he arrived in Afghanistan, Madhwani accompanied a group of fellow Yemenis he had met along the way to "the Arab guesthouse" in Kandahar, where his passport and return airline ticket were confiscated. *Id.* at 108–09. Madhwani was told that his travel documents would be returned after he completed two months of military training. Madhwani reluctantly agreed to the arrangement and, by mid-August, he was transported to a remote mountain camp to begin a course of physical conditioning and small arms instruction.

Madhwani was still at the training camp when al-Qaida attacked the United States on September 11, 2001. The camp was closed down, for fear that it would be bombed, and Madhwani and the other trainees were given permission to

leave. Madhwani took a rifle from the camp's armory and, in the company of two trainers from the camp and a score of fellow recruits, wandered for several months through a succession of Afghan cities. Madhwani claimed that they were all traveling in search of their passports, which—like Madhwani's—had been confiscated before they were sent to the camp. They ended up in Kabul just three days before the capital fell to the United States-led military coalition. Madhwani was reunited with his passport, mysteriously, *infra* p. 8, and he then went to neighboring Pakistan. There he remained for the better part of one year—aside from a brief trip to Iran—moving from one clandestine location to another. Madhwani believed the Pakistani authorities would arrest him, as an Arab, if he were to travel openly to an airport or to the Yemeni embassy to seek help in returning home.

Madhwani was captured along with several other Arabs on September 11, 2002, when Pakistani security forces raided the Karachi apartment building where he had been hiding from the authorities. Two of Madhwani's associates—one from the same apartment and another from across the hall—fought and died in a two-and-one-half hour gun battle with Pakistani soldiers. After spending five days in a Pakistani prison, Madhwani was turned over to U.S. military custody. Madhwani was then taken to a "dark prison" where he claims to have been tortured. He was transferred in October 2002 to the U.S. Naval Base at Guantanamo Bay, Cuba.

Madhwani filed a petition for a writ of habeas corpus on July 15, 2004. The district court conducted a four-day merits hearing in 2009, which included testimony from Madhwani himself, who testified by way of remote video connection from Guantanamo, and by an expert witness who discussed Madhwani's psychological condition. The district court applied the "command structure" standard of detention, under which an

individual is considered to be "part of" al-Qaida—and therefore lawfully detained—if he has " 'receive[d] and execute[d] orders or directions' " from the terrorist organization, *Anam v. Obama*, 696 F. Supp. 2d 1, 4 (D.D.C. 2010) (quoting *Hamlily v. Obama*, 616 F. Supp. 2d 63, 75 (D.D.C. 2009))—a formulation of the "part of" inquiry that we have since rejected as unduly narrow, *Awad v. Obama*, 608 F.3d 1, 11 (D.C. Cir. 2010), *cert. denied*, 79 U.S.L.W. 3362, 3566, 3567 (U.S. Apr. 4, 2011) (No. 10-736). The district court held that evidence showing Madhwani "voluntarily attended an al-Qaida training camp . . . and then traveled, associated, and lived with members of al-Qaida" was sufficient to establish that he functioned under the "command structure" of the organization and thus was "part of" al-Qaida. *Anam*, 696 F. Supp. 2d at 14–15. Accordingly, the district court denied Madhwani's petition. *Id.* at 16.

## II.

The President's detention authority originates with the 2001 Authorization for Use of Military Force (AUMF), which authorizes the President "to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons." Pub. L. No. 107-40, § 2(a), 115 Stat. 224, 224; *see Hamdi v. Rumsfeld*, 542 U.S. 507, 519 (2004) (AUMF "authorized detention" of enemy combatants). We have held that the authority conferred by the AUMF covers at least "those who are part of forces associated with Al Qaeda or the Taliban or those who purposefully and materially support such forces in hostilities against U.S. Coalition partners." *Al-Bihani v. Obama*, 590 F.3d 866, 872 (D.C. Cir. 2010), *cert. denied*, 79 U.S.L.W. 3568 (U.S. Apr. 4, 2011) (No. 10-7814). Determining whether an individual is "part of" al-Qaida or the Taliban is an inquiry that " 'must be made on a case-by-case basis by using a

functional rather than a formal approach and by focusing upon the actions of the individual in relation to the organization.' " *Salahi v. Obama*, 625 F.3d 745, 752 (D.C. Cir. 2010) (quoting *Bensayah v. Obama*, 610 F.3d 718, 725 (D.C. Cir. 2010)). "We review the district court's . . . habeas determination *de novo* . . . ." *Al-Bihani*, 590 F.3d at 870. Because we agree with the district court's conclusion that Madhwani was more likely than not "part of" al-Qaida and find no other error in the district court's handling of the case, we affirm.

## A.

Madhwani argues that there was insufficient evidence to support the district court's conclusion that he was "part of" al-Qaida. Madhwani bears a "heavy burden" in challenging "the district court's factual findings that are the underpinnings of its determination." *Al Odah v. United States*, 611 F.3d 8, 14 (D.C. Cir. 2010), *cert. denied*, 79 U.S.L.W. 3228, 3565, 3567 (U.S. Apr. 4, 2011) (No. 10-439). We review factual findings for clear error and "do not weigh each piece of evidence in isolation, but consider all of the evidence taken as a whole." *Awad*, 608 F.3d at 7. The clear error standard " 'applies to the inferences drawn from findings of fact as well as to the findings themselves.' " *Al Odah*, 611 F.3d at 15 (quoting *Overby v. Nat'l Ass'n of Letter Carriers*, 595 F.3d 1290, 1294 (D.C. Cir. 2010)).

At the outset, we clarify the body of evidence upon which we base our conclusion. The district court considered 260 exhibits and held a four-day merits hearing, during which Madhwani himself testified for over one day. The district court discounted a substantial portion of the Government's evidence—twenty-three reports of interrogations conducted in 2003 and 2004—based on its finding that the evidence was tainted by the mistreatment Madhwani claims to have suffered prior to arriving at Guantanamo Bay. *Anam*, 696 F. Supp. 2d at

5–9. Madhwani now argues that the district court should have disregarded statements he made to the Combatant Status Review Tribunal (CSRT) and Administrative Review Board (ARB) at Guantanamo Bay because those, too, were tainted by the earlier coercion.[1] *See id.* at 9–10. We have no need, however, to reach Madhwani's evidentiary challenge—or for that matter to evaluate the district court's treatment of the allegedly tainted evidence—because the record contains sufficient evidence unaffected by any claim of coercion to uphold the district court's determination that Madhwani was "part of" al-Qaida. *See Esmail v. Obama*, No. 10-5282, --- F.3d ----, 2011 WL 1327701, at *1 (D.C. Cir. Apr. 8, 2011). That evidence consists almost entirely of Madhwani's own testimony.

Notwithstanding the innocent gloss he attempts to graft onto his narrative, Madhwani's testimony reveals a wealth of incriminating detail. When Madhwani arrived in Kandahar, he stayed at an Arab guesthouse that served as a staging area for foreign recruits to be transported to military training facilities. Madhwani's passport and return airline ticket were confiscated by two individuals in the guesthouse, which "was 'standard al Qaeda and Taliban operating procedure[]' when checking into an al Qaeda guesthouse in Afghanistan." *Uthman v. Obama*, No. 10-5235, --- F.3d ----, 2011 WL 1120282, at *5 (D.C. Cir. Mar. 29, 2011) (quoting *Al Odah*, 611 F.3d at 15). He was then taken

---

[1] Madhwani testified before the CSRT on September 23, 2004, and before the ARB in December 2005. Madhwani's testimony in the military proceedings largely mirrored that in the district court but he additionally admitted to seeing Usama bin Laden twice in Afghanistan—once at the training camp and again in Khost during the coalition military campaign—and he did not deny that the Kandahar guesthouse at which he stayed was al-Nebras or that the training camp was al-Farouq.

to a camp "in the middle of the desert, and the mountains," where he engaged in nearly a month of physical conditioning, live fire training with a Kalashnikov rifle and other firearms and received instruction regarding rocket-propelled grenades (RPGs). Tr. 10/27 at 113–14, 116–18; Tr. 10/28 at 32. Although Madhwani now claims he was unaware of any affiliation between al-Qaida and the guesthouse or training camp, the district court found that his descriptions were "consistent" with al-Nebras guesthouse, a known way station for al-Qaida recruits, and al-Farouq training camp, an al-Qaida facility where several of the September 11, 2001 hijackers trained. *Anam*, 696 F. Supp. 2d at 11–12; *see Al-Adahi v. Obama*, 613 F.3d 1102, 1102, 1107 (D.C. Cir. 2010), *cert. denied*, 131 S. Ct. 1001 (2011). As we have noted before, "if a person stays in an al-Qaida guesthouse or attends an al-Qaida training camp, this constitutes 'overwhelming' evidence that the United States had authority to detain that person." *Al-Adahi*, 613 F.3d at 1109 (quoting *Al-Bihani*, 590 F.3d at 873 n.2).

Madhwani's connections to al-Qaida, however, did not stop there. When the camp closed after September 11, 2001 Madhwani left in the company of about twenty other recruits, guided by two "trainers" from the camp. Tr. 10/27 at 129–31. Madhwani was "told" to take a rifle from the camp's armory and, although he claims that he did not want to carry a weapon, he "could not" get rid of it because he was "afraid to get in trouble." *Id.* at 133. We have found in other detainee cases that "carrying a brigade-issued weapon" is evidence that in combination with other factors may "strongly suggest" affiliation with enemy forces. *Al-Bihani*, 590 F.3d at 872–73; *cf. Al Odah*, 611 F.3d at 15–16.

From al-Farouq, Madhwani and his fellow recruits embarked on a dizzying odyssey across Afghanistan, returning from the camp to Kandahar, traveling from Kandahar to Kabul

and then on to Khost. The two camp trainers eventually "saw that there was nothing happening" and left the group. Tr. 10/27 at 141. Madhwani and his remaining companions decided to go back to Kabul. They arrived just three days before the capital fell to the advancing forces of the Northern Alliance. As in *Al-Adahi*, Madhwani's movements in Afghanistan in the midst of the military conflict between the United States-led coalition and the Taliban and its al-Qaida allies may not be "conclusive" evidence of association with enemy forces but the movements "add to the weight of the government's case." 613 F.3d at 1110.

The ostensible purpose of each leg of Madhwani's journey back and forth across Afghanistan, according to his testimony, was to search out the people who held his passport. After Kabul fell, Madhwani claimed that he joined civilian refugees fleeing the capital toward Khost and soon fell in with a large group traveling on foot through mountainous terrain towards Pakistan. There, as Madhwani and others were staying in abandoned houses, one day a stranger driving a car approached them and asked, according to Madhwani's testimony, "did anybody lose their passports, clothes, personal stuff, you know, like tape recorders, or anything." Tr. 10/27 at 145–46. Fortuitously, according to Madhwani, he found his passport among the lost-and-found items in the car. Although the district court credited other aspects of Madhwani's testimony, it found that "mere happenstance" could not explain how Madhwani recovered his passport from al-Qaida custody. *Anam*, 696 F. Supp. 2d at 15. We agree with the district court and find Madhwani's explanation implausible. *See Al-Adahi*, 613 F.3d at 1107 ("[F]alse exculpatory statements are evidence—often strong evidence—of guilt.").

Finally, the circumstances surrounding Madhwani's capture nearly one year later indicate a continuing association with al-Qaida. Although Madhwani apparently surrendered peacefully

to Pakistani forces, two of his associates fought to the death rather than be taken alive—a Yemeni named Ammar, who had been staying in the same apartment as Madhwani, and another Arab from the apartment across the hall known to Madhwani as "Hamza the Syrian" or "Hamza the Palestinian" and later identified as Hamza Zubair. Tr. 10/27 at 166. Madhwani testified that Zubair sometimes "pray[ed] with us" or "watch[ed] TV with us." *Id.* at 166–67. The district court found that Zubair was a member of al-Qaida. *Anam*, 696 F. Supp. 2d at 14. Madhwani's association with enemy forces at the moment of his capture constitutes further evidence that he was "part of" al-Qaida. *See Uthman*, 2011 WL 1120282, at *4 (finding it "highly significant" that detainee was "captured in the company of a Taliban fighter and two al Qaeda members").

Madhwani now argues that the district court's factual finding with respect to Zubair was clearly erroneous because it was based in part on interrogation reports from two other detainees, which reports Madhwani contends are contradictory and unreliable. We see no clear error here. The two reports differ slightly in their physical descriptions of Zubair but they corroborate each other in the most important details: both identify Hamza Zubair as an Egyptian who taught "mountain tactics" at al-Farouq training camp. The task of resolving "discrepancies among the various accounts" offered into evidence is "quintessentially a matter for the jury"—or, here, for the district judge sitting as the fact-finder. *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 561 (D.C. Cir. 1993). The district court, moreover, highlighted the significance of the fact that Zubair "fought to the death to avoid capture." *Anam*, 696 F.

Supp. 2d at 14. We hold, accordingly, that the district court did not err in finding Zubair was a member of al-Qaida.[2]

In light of Madhwani's guesthouse and military training camp admissions, his carrying a rifle at the behest of camp superiors, his suspicious movements and implausible narrative and his final capture in the company of at least one known al-Qaida operative, we conclude that a preponderance of the evidence unmistakably showed Madhwani was "part of" al-Qaida when he was captured.

## B.

In addition to challenging the sufficiency of the evidence, Madhwani offers a laundry list of evidentiary and legal complaints. None establishes a convincing basis for us to reverse the district court's denial of habeas corpus relief.

Madhwani asserts that the district court improperly relied on evidence outside the record. Madhwani cites a passing reference the district judge made, during his oral ruling from the bench, to a newspaper article about a group of aspiring terrorists who were "turned down because they did not have the credentials." Tr. 12/14 at 52. We note at the outset that the legal basis for Madhwani's objection is obscure. The case relied upon by Madhwani held that referring to evidence outside the record during a criminal trial "would be a denial of due process,"

---

[2]Zubair's connection with al-Qaida is the subject of Madhwani's pending motion pursuant to Fed. R. Civ. P. 60(b) for relief from the judgment. Whether any new evidence Madhwani submits regarding that connection is persuasive enough to establish Zubair was not connected with al-Qaida or, by extension, Madhwani was not a part of al-Qaida "at the time of his capture," *see Salahi*, 625 F.3d at 751, is a question we leave the district court to resolve in the first instance.

*Garner v. Louisiana*, 368 U.S. 157, 173 (1961), but "[t]his Court has . . . stated that the detainees [at Guantanamo Bay] possess no constitutional due process rights." *Kiyemba v. Obama* (*Kiyemba II*), 561 F.3d 509, 518 n.4 (D.C. Cir. 2009) (citing *Kiyemba v. Obama* (*Kiyemba I*), 555 F.3d 1022, 1026–27 (D.C. Cir. 2009)), *cert. denied*, 130 S. Ct. 1880 (2010). We need not address the underlying legal basis for Madhwani's objection, however, because we disagree with his assertion that the district court "relied" on the newspaper article at all: no mention of it appears in the district court's written opinion and order. *See Anam*, 696 F. Supp. 2d 1. Even assuming Madhwani had a constitutional right to due process and assuming the district court violated it by relying on evidence outside the record—premises we do not accept—such error would be "harmless beyond a reasonable doubt," *Chapman v. California*, 386 U.S. 18, 23–24 (1967), given the conclusive weight of the record evidence linking Madhwani to al-Qaida.

Madhwani claims that the district court erred in denying his request for further discovery regarding, *inter alia*, the two detainees whose statements the district court cited in support of its finding that Hamza Zubair was a member of al-Qaida. We review the district court's management of the discovery process for abuse of discretion, *see Bensayah*, 610 F.3d at 724, and we find no abuse of discretion here. The district court's Case Management Order (CMO) requires the government to produce all "reasonably available" exculpatory evidence and allows petitioners to request further discovery under certain specified conditions. *In re Guantanamo Bay Detainee Litig.*, 2008 WL 4858241, at *1–2 (D.D.C. Nov. 6, 2008); *see Bensayah*, 610 F.3d at 724 (upholding CMO discovery standard as "consistent" with *Boumediene v. Bush*, 553 U.S. 723 (2008)). Madhwani's discovery request, however, did not establish the conditions required under the CMO for further discovery. The

request—which consisted of a blanket demand for statements made by eight different detainees—was neither "narrowly tailored" nor did it offer any detail to "explain why" further discovery was needed with respect to the individual detainees. Pet'r's Mot. for Discovery, *Anam v. Bush*, No. 1:04 CV 1194, at 6–8 (D.D.C. Mar. 16, 2009); *In re Guantanamo Bay Detainee Litig.*, 2008 WL 4858241, at *2.

Finally, Madhwani raises a series of arguments that we reject out of hand. Although Madhwani contends that the district court applied an erroneous legal standard to support detention, we have repeatedly held that the "command structure" test employed by the district court "is *sufficient* to show that person is part of al Qaeda" but "is not *necessary*." *Uthman*, 2011 WL 1120282, at *2 (emphasis in original); *see also, e.g.*, *Awad*, 608 F.3d at 11–12. In fact, any legal error worked in Madhwani's favor for the "command structure" test "does not reflect the full scope of the Executive's detention authority under the AUMF." *Uthman*, 2011 WL 1120282, at *2. Madhwani also contests the admission of hearsay evidence not falling within any exception recognized by the Federal Rules of Evidence and the application of the preponderance of the evidence standard. He admits, however, that we have considered and rejected the same arguments before. Thus we conclude that Madhwani's remaining arguments are foreclosed as a matter of circuit precedent. *See Al-Bihani*, 590 F.3d at 878–81; *Awad*, 608 F.3d at 10–11.

For the foregoing reasons, we affirm the district court's denial of Madhwani's petition for a writ of habeas corpus.

*So ordered.*