# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued November 4, 2010              Decided July 22, 2011

No. 09-5125

MOATH HAMZA AHMED AL ALWI, DETAINEE,
APPELLANT

v.

BARACK OBAMA, PRESIDENT OF THE UNITED STATES, ET AL.,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:05-cv-02223)

---

*Ramzi Kassem* argued the cause for appellant.  With him on the briefs were *Zachary Katznelson*, *William J. Murphy*, and *John J. Connolly*.

*Sarang V. Damle*, Attorney, U.S. Department of Justice, argued the cause for appellees.  With him on the brief were *Ian Heath Gershengorn*, Deputy Assistant Attorney General, and *Robert M. Loeb*, Attorney.  *Matthew M. Collette* and *August E. Flentje*, Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney, entered appearances.

Before: TATEL and GARLAND, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*:  This is an appeal from the denial of the petition of Moath Hamza Ahmed Al Alwi -- a detainee at the United States Naval Base at Guantanamo Bay, Cuba -- for a writ of habeas corpus.  For the reasons stated below, we affirm the judgment of the district court.

## I

Al Alwi is a Yemeni citizen who was raised in Saudi Arabia.  According to the government, he traveled to Afghanistan sometime in or around 2000, intending to join the Taliban's fight against the Northern Alliance.  By the government's account, Al Alwi stayed in several guesthouses associated with the Taliban, and in at least one that was associated with al Qaeda where he turned over his passport.  Taliban fighters escorted him between two of the guesthouses.  Thereafter, he traveled to a Taliban-linked training camp near Kabul, where he was trained to fire a rocket-propelled grenade launcher and was issued a Kalashnikov rifle, ammunition magazines, and grenades.  Al Alwi then joined a combat unit, led by a high-ranking al Qaeda official, that fought with the Taliban on two different fronts.  Al Alwi did not leave the unit until well after September 11, 2001, by which time his unit had been bombed by United States warplanes responding to the terrorist attacks of that date.  Al Alwi fled to Pakistan, where he was captured and subsequently turned over to U.S. authorities.  Since then, Al Alwi has been a detainee at Guantanamo Bay.

In 2005, Al Alwi -- through his cousin as next friend -- filed a petition for a writ of habeas corpus, which was held in abeyance until the Supreme Court ruled, in *Boumediene v. Bush*, that "the constitutional privilege of habeas corpus" extends to aliens detained as enemy combatants at Guantanamo.  553 U.S.

723, 732 (2008). In the meantime, pursuant to the Detainee Treatment Act of 2005 (DTA), Pub. L. No. 109-148, tit. X, 119 Stat. 2680 (codified at 28 U.S.C. § 2241 (2005)), Al Alwi filed an appeal from the determination of his Combatant Status Review Tribunal (CSRT) that he was an enemy combatant, an appeal that was subsequently dismissed for lack of jurisdiction.[1] In the summer of 2008, after the Supreme Court issued *Boumediene*, the district court reinitiated his habeas proceedings. On December 16-17, 2008, the court held a habeas hearing for Al Alwi.

Following the hearing, the district court found that a preponderance of the evidence supported the government's account of Al Alwi's activities in Afghanistan. Dist. Ct. Op. at 4, 6, 10 (Jan. 9, 2009) (J.A. 1797, 1799, 1803).[2] It reached this conclusion largely on the basis of Al Alwi's own interrogation statements, the majority of which were not disputed by his counsel at the habeas hearing.[3] In light of its factual findings,

---

[1] *Al Alwi v. Gates*, No. 07-1251 (D.C. Cir. Mar. 26, 2009); *see Bismullah v. Gates*, 551 F.3d 1068 (D.C. Cir. 2009) (holding that the section of the DTA that granted this court jurisdiction over petitions to review CSRT determinations could not be severed from the provision that eliminated habeas corpus jurisdiction, a provision the Supreme Court had held unconstitutional in *Boumediene*, and therefore dismissing the petitions and remitting the petitioners to their remedy under the habeas corpus statute).

[2] All references to "Dist. Ct. Op." are to a declassified version of the district court's classified opinion that is contained in the declassified Joint Appendix. *See Al Alwi v. Bush*, No. 05-2223 (D.D.C. Jan. 9, 2009) (J.A. 1794).

[3] The government also presented evidence that Al Alwi was a member of Osama Bin Laden's personal bodyguard force, and that he trained at al Qaeda's al-Farouq training camp. Gov't Factual Return

4

the court determined that Al Alwi was being lawfully detained because it was "more probable than not that [Al Alwi] was 'part of or supporting Taliban or al Qaeda forces' both prior to and after the initiation of U.S. hostilities in October 2001." Dist. Ct. Op. at 10 (J.A. 1803). Accordingly, the court denied Al Alwi's habeas petition.

On appeal, Al Alwi raises two categories of challenges to the denial of his petition. He argues that the district court erred in determining that he was being lawfully detained on the record as it stood before that court. And he further argues that the court's procedural errors deprived him of a meaningful opportunity to develop a record upon which he could challenge his detention. We consider these arguments in Parts II and III.

II

Al Alwi challenges, on two grounds, the district court's substantive determination that he was being lawfully detained. First, he contends that the court applied the wrong detention standard. Second, he maintains that the court erred in resting its determination primarily on his own statements because those statements were not sufficiently corroborated. "We review the

---

at 12-13, 16-20 (J.A. 385-86, 389-93); *see Al-Adahi v. Obama*, 613 F.3d 1102, 1108 (D.C. Cir. 2010) (noting that "[a]t least eight of the September 11th hijackers had trained at Al Farouq"). Al Alwi did not make such admissions during his interrogations, and his counsel vigorously disputed them at the habeas hearing. In light of its finding that the account of Al Alwi's activities contained in his own statements was sufficient to justify his detention, the district court declined to evaluate the evidence supporting those additional charges. *See* Dist. Ct. Op. at 10 n.2 (J.A. 1803). We decline to do so as well. *See Uthman v. Obama*, 637 F.3d 400, 404 n.5 (D.C. Cir. 2011).

district court's findings of fact for clear error, its habeas determination de novo, and any challenged evidentiary rulings for abuse of discretion." *Al-Bihani v. Obama*, 590 F.3d 866, 870 (D.C. Cir. 2010) (internal citations omitted); *see Bensayah v. Obama*, 610 F.3d 718, 722-23 (D.C. Cir. 2010).

A

Following the al Qaeda attacks against the United States on September 11, 2001, Congress passed the Authorization for Use of Military Force (AUMF).[4] Adopting a detention standard offered by the government, the district court held that the United States has authority, pursuant to the AUMF, to detain an individual who, more likely than not:

> was part of or supporting Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against the United States or its coalition partners.

*Al Alwi v. Bush*, 593 F. Supp. 2d 24, 27 (D.D.C. 2008). After examining the evidence, the court found that "it is more probable than not that petitioner was supporting the Taliban and al Qaeda in a manner consistent with the [detention standard]

---

[4]The AUMF provides:

> [T]he President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

Pub. L. No. 107-40, § 2(a), 115 Stat. 224 (2001) (reprinted at 50 U.S.C. § 1541 note).

this court has adopted." Dist. Ct. Op. at 9-10 (J.A. 1802-03); *see Al Odah v. United States*, 611 F.3d 8, 13 (D.C. Cir. 2010) ("It is now well-settled law that a preponderance of the evidence standard is constitutional in considering a habeas petition from an individual detained pursuant to authority granted by the AUMF.").

Subsequent to the district court's decision, the government adopted a narrower detention standard, which it has relied on in this and other Guantanamo appeals. *See, e.g.*, *Bensayah*, 610 F.3d at 722 n*; *Barhoumi v. Obama*, 609 F.3d 416, 423 (D.C. Cir. 2010); *Al-Bihani*, 590 F.3d at 870 n.1. The new standard retains the original "part of" prong of the former standard, but modifies the "support" prong to require "substantial" support. Under this standard, the government may detain an individual who, more likely than not:

> [was] part of, or *substantially* supported, Taliban or al-Qaida forces or associated forces that are engaged in hostilities against the United States or its coalition partners.

Gov't Br. 19 (emphasis added) (internal quotation marks omitted). For purposes of this appeal, Al Alwi does not dispute the lawfulness of this standard. *See* Pet'r Br. 47-48, 64 n.18; *see also Al-Bihani*, 590 F.3d at 872. Al Alwi maintains that we should remand this case to the district court so that it can decide, in the first instance, whether the government's evidence meets the "substantial support" standard.

As we have explained, "whether a detainee's alleged conduct -- e.g., visiting an al-Qaida guesthouse or training at an al-Qaida camp -- justifies his detention under the AUMF is a legal question" that we review de novo. *Barhoumi*, 609 F.3d at 423; *see Almerfedi v. Obama*, No. 10-5921, 2011 WL 2277607,

at *4 (D.C. Cir. June 10, 2011); *Uthman v. Obama*, 637 F.3d 400, 403 (D.C. Cir. 2011).[5] "On review, we ask whether the evidence in the *whole* record . . . establishes that a petitioner's detainability is more likely justified than not." *Almerfedi* , 2011 WL 2277607, at *4. Accordingly, if we are persuaded that the record evidence establishes the petitioner's detainability, a remand is not required. *See id.* at *1 (concluding "as a matter of law that the government has demonstrated by a preponderance of the evidence that [the petitioner] can be detained," and reversing without remanding "the district court's decision granting [the detainee's] petition"); *see also Uthman*, 637 F.3d at 402; *Al-Adahi v. Obama*, 613 F.3d 1102, 1106 (D.C. Cir. 2010). There may, of course, be cases in which a remand is warranted because further fact-finding by the district court is necessary or would be helpful. *See Salahi v. Obama*, 625 F.3d 745, 752-53 (D.C. Cir. 2010) (vacating the district court's grant of the writ, but remanding "[b]ecause additional fact-finding is required to resolve" whether the detainee was "part of" al Qaeda "under this circuit's evolving case law"). But where "the facts found by the District Court, along with uncontested facts in the record, demonstrate that [the detainee] more likely than not" falls within the detention standard, we may resolve the matter on our own. *Uthman*, 637 F.3d at 402.

Nor need we consider whether the detainee "substantially supported" al Qaeda or the Taliban if we are persuaded that he was "part of" either entity. As this court has now repeatedly held, the AUMF "gives the United States government the authority to detain a person who is found to have been 'part of' al Qaeda or Taliban forces." *Al Odah*, 611 F.3d at 10; *see Awad*

---

[5]By contrast, "[t]he question whether the government has proven that conduct -- e.g., whether [the detainee] in fact stayed at an al-Qaida guesthouse or trained at an al-Qaida camp -- is a factual question that we review for clear error." *Barhoumi*, 609 F.3d at 423.

*v. Obama*, 608 F.3d 1, 11-12 (D.C. Cir. 2010); *Al-Adahi*, 613 F.3d at 1103; *see also Esmail v. Obama*, 639 F.3d 1075, 1076 (D.C. Cir. 2011) (noting that we review de novo whether the detainee satisfies the "part of" standard). Hence, if we conclude that the record establishes that it is more likely than not that Al Alwi was "part of" al Qaeda or the Taliban, there is no need for us to address the "substantial support" prong of the detention standard or to remand the case. *See Uthman*, 637 F.3d at 402 (concluding "that the facts found by the District Court, along with uncontested facts in the record, demonstrate that [the detainee] more likely than not was part of al Qaeda," and therefore reversing the contrary judgment of that court without requiring a hearing on remand); *Al-Adahi*, 613 F.3d at 1106 (reversing and remanding with instructions to deny the detainee's petition because the evidence showed that the detainee "was -- at the very least -- more likely than not a part of al-Qaida"); *see also Almerfedi*, 2011 WL 2277607, at *6.

Here, the facts found by the district court are alone sufficient for us to conclude that Al Alwi was "'part of' al Qaeda or Taliban forces."[6] The district court found that Al Alwi traveled to Pakistan, and then on to Afghanistan, "specifically in order to join the Taliban's fight against the Northern Alliance." Dist. Ct. Op. at 4-5 (J.A. 1797-98). Along the way, the court found, he stayed in "at least three guesthouses closely associated with the Taliban and/or al Qaeda." *Id.* Al Alwi described his escorts between the first two guesthouses as Taliban fighters. *Id.* at 5 (J.A. 1798). The court also found that the second guesthouse, the al-Ansar guesthouse in Kandahar, Afghanistan, "had strong connections to al Qaeda." *Id.* at 4 (J.A. 1797). Al Alwi identified the assistant to the guesthouse's leader in a

---

[6]In Part II.B, *infra*, we address Al Alwi's contention that the district court committed clear error and/or abused its discretion in finding those facts.

photograph with Osama Bin Laden. *Id.* Upon arrival at the Kandahar guesthouse, Al Alwi turned over his passport and money. Al Alwi then stayed in the Kandahar guesthouse for six weeks. When he left, he retrieved his money but did not retrieve his passport, a practice followed by other al Qaeda and Taliban recruits. *Id.* at 4-5 (J.A. 1797-98).

The court further found that, after Al Alwi left the third, Taliban-linked guesthouse in Kabul, he traveled in a Taliban vehicle to a "Taliban-related" training camp known as the Khalid Center. Dist. Ct. Op. at 6, 8 (J.A. 1799, 1801). There, he received at least one day's training on a rocket-propelled grenade launcher (RPG), fired an RPG, and received a Kalashnikov rifle, ammunition magazines, and grenades. *Id.* at 6 (J.A. 1799). He then joined a combat unit, the Omar Sayef Group, that fought the Northern Alliance and related forces on two fronts. *Id.* at 6-7 (J.A. 1799-1800). While with that unit, Al Alwi fought under the leadership of an Iraqi named Abd al-Hadi, a high-level al Qaeda member responsible for commanding Arab and Taliban troops in Kabul. *Id.* at 8 (J.A. 1801). The court found that Al Alwi was assigned to a "middle line" or secondary (defensive) position at a front north of Kabul, where he remained for five to six months, during which time "he was subject to several artillery attacks and saw other fighters die." *Id.* at 6-7 (J.A. 1799-1800). Upon orders from the head of the unit, he then moved to a second front in the far north of Afghanistan, near the Tajikistan border, for the "express purpose of repelling enemy forces." *Id*. at 7-8 (J.A. 1800-01). There, he spent another three to five months, during which time the fighters he was with exchanged fire with Tajiks. *Id.* at 7 (J.A. 1800).

Finally, the court found that Al Alwi was with Taliban forces that were attacked by United States warplanes after September 11, 2001, "and stayed with his Taliban unit for a

period of time thereafter." Dist. Ct. Op. at 9 (J.A. 1802). "[M]ost of the people with whom [he] served in northern Afghanistan were killed by U.S. bombs following the commencement of Operation Enduring Freedom," and he saw two or three American bombing operations before he moved south to Kabul and later to Khowst with others in his fighting unit. *Id*. It was only in Khowst that he returned his weapons, before fleeing Afghanistan for Pakistan, where he was captured and turned over to U.S. authorities. *Id.*

Taking all of these findings together, the district court concluded that "it is more probable than not that petitioner was supporting the Taliban and al Qaeda." Dist. Ct. Op. at 9-10 (J.A. 1802-03). Although the court did not expressly say whether Al Alwi was also "part of" the Taliban, it did repeatedly describe him as serving with "his Taliban unit." *Id.* at 9 (J.A. 1802); *Al Alwi v. Bush*, 593 F. Supp. 2d at 28. In any event, it is plain to us that the foregoing facts, taken together (and if not clearly erroneous), are sufficient to establish that Al Alwi more likely than not was "part of" the Taliban or al Qaeda -- a point the petitioner does not seriously dispute.[7] *See Al-Madhwani v.*

_____

[7]Al Alwi does maintain that the district court failed to make the findings necessary to sustain a second part of the detention standard, noting that the government must show not only that he was part of Taliban or al Qaeda or associated forces, but also that those forces "'*are* engaged in hostilities against the United States or its coalition partners.'" Pet'r Br. 48 (quoting *Al-Bihani*, 590 F.3d at 872 (emphasis added)); *see Awad*, 608 F.3d at 11. Although he acknowledges this court's ruling in *Al-Bihani* that the United States is still engaged in hostilities with the Taliban and al Qaeda, 590 F.3d at 874-75, Al Alwi contends that (at most) he fought with an associated force, and that to detain him the government must show that this force (and not just the Taliban or al Qaeda) was still engaged in hostilities against the United States at the time of his habeas hearing. This argument has two flaws. First, Al Alwi did not raise it in the district court; his only argument

*Obama*, No. 10-5172, 2011 WL 2083932, at \*4 (D.C. Cir. May 27, 2011) (stating that "'carrying a brigade-issued weapon' is evidence that in combination with other factors may 'strongly suggest' affiliation with enemy forces" (quoting *Al-Bihani*, 590 F.3d at 872-73)); *Esmail*, 639 F.3d at 1076 (holding that "training at . . . al Qaeda training camps is compelling evidence that the trainee was part of al Qaeda"); *Al Odah*, 611 F.3d at 16 (holding that, inter alia, training at a Taliban-run camp on an AK-47 rifle, and receiving and carrying an AK-47 for days during which time petitioner and his fellows were attacked by U.S. warplanes, support the conclusion that he was "'part of' the Taliban and al Qaeda forces"); *Al-Bihani*, 590 F.3d at 872 (holding that, inter alia, accompanying a fighting unit on the battlefield, carrying a weapon issued by the unit, and retreating under unit orders "strongly suggest . . . that [the detainee] was part of" the unit); *see also Al-Madhwani*, 2011 WL 2083932, at \*3 (finding that the practice of leaving one's passport and valuables "'was standard al Qaeda and Taliban operating procedure[] when checking into an al Qaeda guesthouse in Afghanistan'" (quoting *Uthman*, 637 F.3d at 406) (internal quotation marks omitted)); *Al Odah*, 611 F.3d at 15 (noting that relinquishing a passport and belongings "was standard al Qaeda and Taliban operating procedure[]"); *Al-Adahi*, 613 F.3d at 1108 (concluding that "an individual's attendance at an al-Qaida

there, *see* Pet'r Mot. for Reconsideration at 1 (J.A. 362), was one that was rejected in *Al-Bihani* -- that the hostilities in Afghanistan have ceased. *See Nat'l Fed'n of Fed. Employees v. Greenberg*, 983 F.2d 286, 288 (D.C. Cir. 1993) ("[C]laims neither raised nor addressed below usually may not be heard on appeal."). Second, as we hold in the text, the district court's findings are sufficient to establish that Al Alwi was "part of the Taliban or al Qaeda," not merely part of a separate, "associated" force. Accordingly, even if it were not waived, the argument would have no application to Al Alwi's case.

guesthouse" was powerful evidence that "the individual was part of al-Qaida" (quoting *Al-Bihani*, 590 F.3d at 873 n.2)).

B

Al Alwi contends that, even if the district court's fact-findings are sufficient to satisfy the appropriate detention standard, the court's judgment should nonetheless be vacated because those findings erroneously rested on statements by Al Alwi that were insufficiently corroborated.  In support of this proposition, he cites the "corroboration rule," applicable in federal criminal trials, which provides that a conviction may not rest solely on "the uncorroborated admission or confession of the accused." *Wong Sun v. United States*, 371 U.S. 471, 488-89 (1963); *see Smith v. United States*, 348 U.S. 147, 152-53 (1954); *United States v. Dickerson*, 163 F.3d 639, 641 (D.C. Cir. 1999).

This court has expressed some skepticism as to whether "the Supreme Court would today" apply the corroboration rule, even in the criminal context. *Dickerson*, 163 F.3d at 641 n.2. Be that as it may, the district court's determination here was made in a habeas proceeding, not a criminal trial, and such proceedings are not "subject to all the protections given to defendants in criminal prosecutions." *Al-Adahi*, 613 F.3d at 1111 n.6; *see Boumediene*, 553 U.S. at 783; *Al-Bihani*, 590 F.3d at 876.  Rather, what "[t]he habeas court must have" is "sufficient authority to conduct a meaningful review of both the cause for detention and the Executive's power to detain." *Boumediene*, 553 U.S. at 783.  The corroboration rule is a "common law" rule, with neither constitutional nor statutory bases, *Dickerson*, 163 F.3d at 641; *see Smith*, 348 U.S. at 153, and we have not previously regarded corroboration as a requirement of a meaningful habeas proceeding.  To the contrary, we have recently upheld a detainee's detention based on "evidence [that] consist[ed] almost entirely of [the

detainee's] own testimony." *Al-Madhwani*, 2011 WL 2083932, at *3; *see also Al-Bihani*, 590 F.3d at 870 (upholding detention where the evidence was "primarily drawn from [the detainee's] own admissions during interrogation").

At oral argument, Al Alwi's counsel acknowledged the force of this general argument, and clarified that he was not advocating the per se application of the common law rule. Oral Arg. Tr. 11-13. Rather, he contended that the court must take the absence of corroboration into account in assessing the reliability of the petitioner's out-of-court statements. *Id*. at 13. We agree with this contention because it is in line with our own precedents, which have explained that "the question a habeas court must ask when presented with hearsay is not whether it is admissible[,] . . . but what probative weight to ascribe to whatever indicia of reliability it exhibits." *Al-Bihani*, 590 F.3d at 879. The question whether evidence is sufficiently reliable to credit is one we review for clear error. *See Barhoumi*, 609 F.3d at 424; *Awad*, 608 F.3d at 8. *But cf. Al Odah*, 611 F.3d at 13-14 (concluding that a district court's decision that certain hearsay evidence was reliable "was no abuse of discretion").

In this case, the district court did evaluate the reliability of Al Alwi's statements before accepting them. The court noted that its duty was to "assess whether petitioner's interrogation reports are 'sufficiently reliable and sufficiently probative to demonstrate the truth of the asserted proposition with the requisite degree of certainty.'" Dist. Ct. Op. at 2 (J.A. 1795) (quoting *Parhat v. Gates*, 532 F.3d 834, 847 (D.C. Cir. 2008)). It then gave several reasons for finding the statements reliable. The court found that, from the time his "fear of retribution dissipated," Al Alwi "consistently reported the essential details of [his] story . . . over the course of multiple interrogation sessions." *Id.* at 3 (J.A. 1796). Although Al Alwi "made generalized allegations that he was subject to" harsh

interrogation tactics, he did "*not* contend that he gave false answers during any particular interrogation session with U.S. officials as a result of these alleged tactics." *Id.* Indeed, although Al Alwi "disagree[d] with many of the inferences the Government draws from the reports, . . . [he] d[id] not deny the majority of the principal facts" upon which the court relied. *Id.*

We find neither clear error nor abuse of discretion in the district court's determination that Al Alwi's statements were reliable. In addition to the consistency of Al Alwi's repeated statements, we note, as the court stressed, that Al Alwi did not deny -- either at the hearing or in his pre-hearing filings -- that "the majority of the principal facts" in his interrogation statements were true. Dist. Ct. Op at 3 (J.A. 1796). Moreover, at the habeas hearing, his attorney expressly conceded or did not disavow several of those facts. *See, e.g.*, Hr'g Tr. 10 (Dec. 16, 2008) (J.A. 1457) (conceding that Al Alwi traveled to Afghanistan to fight against the opponents of the Taliban in the Afghan civil war); Amended Traverse at 4 (J.A. 940) (same); Hr'g Tr. 75-78 (Dec. 16, 2008) (J.A. 1608-11) (stating that Al Alwi "doesn't disavow the Omar Sayef Group part of the narrative"); *id.* at 111-12 (J.A.1644-45) (stating that "I don't think he denies that he was issued" a Kalashnikov rifle, four magazines, and two grenades). As we have said before, a detainee's decision to "not contest the truth of the majority of his admissions upon which the district court relied . . . enhanc[es] the reliability of those reports." *Al-Bihani*, 590 F.3d at 880; *see Esmail*, 639 F.3d at 1077 (affirming detention based on the petitioner's concessions and the district court's rejection of his exculpatory explanations).

Finally, we note that, although the district court did largely rely on Al Alwi's own statements to establish underlying facts, it also relied on government evidence to support important inferences from those facts. For example, while Al Alwi stated

that he stayed in a particular Kandahar guesthouse for approximately six weeks, it was a government expert's declaration that identified that guesthouse as having strong connections to al Qaeda. Dist. Ct. Op. at 4 (J.A. 1797). That inference, in turn, was "reinforced by petitioner's [statement that] he recognized the assistant to the guesthouse's leader . . . in a photograph with Usama Bin Laden." *Id*. Similarly, while Al Alwi admitted that he turned over his passport to the guesthouse's leader and never retrieved it, it was another expert declaration that identified this conduct as consistent with common practice by Taliban and al Qaeda recruits. *Id.* at 5 (J.A. 1798).

For the foregoing reasons, we reject Al Alwi's contention that the district court's findings of fact are clearly erroneous. And because, as explained in Part II.A, those findings are enough to establish that Al Alwi was "part of the Taliban or al Qaeda," we reject the petitioner's contention that the record before the district court was insufficient to establish the lawfulness of his detention.

III

In addition to his challenge to the district court's substantive determinations, Al Alwi contends that the court committed procedural errors that deprived him of the "meaningful opportunity to demonstrate that he is being held" unlawfully that *Boumediene* requires. 553 U.S. at 779. We review the challenged decisions -- the court's denial of Al Alwi's request for a continuance and its treatment of his discovery requests -- for abuse of discretion. *See United States v. Celis*, 608 F.3d 818, 839 (D.C. Cir. 2010) (denial of a continuance); *Al Odah v. United States*, 559 F.3d 539, 544 (D.C. Cir. 2009) (denial of discovery).

A

Al Alwi contends that the district court abused its discretion in denying his request for a thirty-day continuance of the deadline for filing his traverse.[8]  When the court began considering Al Alwi's habeas petition in the summer of 2008, it set an ambitious schedule for the proceedings.  Citing *Boumediene*'s call for expedition in holding detainee habeas proceedings, *see* 553 U.S. at 795, the district court stated its intention to hear Al Alwi's case before the end of the year. Status Conf. Tr. 11-12 (July 10, 2008) (J.A. 125P-125Q).  On July 31, 2008, the court ordered the government to file its factual return by September 23, 2008.  *See supra* note 8.  The government subsequently sought and received a thirty-day continuance, finally filing the return on October 22, 2008.  The court then ordered that discovery be completed by December 1, 2008, and that Al Alwi file his traverse by December 4, 2008. The habeas hearing was set for December 16.

 Al Alwi's counsel had scheduled a meeting to go over the government's factual return with Al Alwi during the week of October 6, 2008, in Guantanamo.  After the court granted the government a continuance to file the return by October 22, counsel scheduled additional meetings for November 14 and 15. When the attorneys arrived, Al Alwi informed them that he had begun a hunger strike.  Although he was able to meet with the lawyers the first day, he was unable to continue on the second. When counsel returned from Guantanamo, they requested a

---

[8]Under the district court's Case Management Order, "[t]he Government was required to submit a return stating the factual and legal bases for detaining th[e] prisoner, who was then required to file a traverse stating the relevant facts in support of his petition and a rebuttal of the Government's legal justification for his detention." *Bensayah*, 610 F.3d at 721.

thirty-day continuance of the deadline for filing the traverse. They explained that they had not had sufficient opportunity to discuss the government's allegations due to Al Alwi's inability to meet on November 15, *see* Pet'r Unopposed Mot. for Extension of Time at 5 (J.A. 796), and that they had begun making arrangements to meet with him instead on the next available date, December 5, *see id.* at 6 (J.A. 797).

Although the government did not oppose counsel's request for a continuance, the district court nonetheless denied it, stating, in part, that Al Alwi was the "author of his own delay" because he had chosen to go on the hunger strike that left him unable to meet on November 15. Status Hr'g Tr. 9 (Dec. 1, 2008) (J.A. 846). The district court did, however, indicate that counsel could seek leave to amend the traverse if new information came to light in the later meetings with Al Alwi that by then had been scheduled for December 5 and 6. *Id.*

Al Alwi contends that the denial of his motion for a continuance was an abuse of discretion. He points out that the "requested delay was trivial," that he "had not sought other continuances," and that "on the contrary, [he] had consistently pressed forward." Pet'r Br. 31. He also notes that the court had granted the government a continuance to prepare its own return, and that the government did not object to the grant of a similar continuance for his traverse. Under these circumstances, we agree with Al Alwi that the denial of the thirty-day continuance is hard to understand. There was certainly no magic in the court's self-imposed deadline of hearing the case before December 31, 2008. In *Boumediene*, the Supreme Court declared that "the detainees . . . are entitled to a prompt habeas corpus hearing." 553 U.S. at 795. This was indeed a call to act, but it was not a call to act in haste.

Nonetheless, we cannot disturb the district court's judgment unless the petitioner shows "that actual prejudice resulted from the denial" of the requested continuance. *Celis*, 608 F.3d at 839 (citing *United States v. Kelley*, 36 F.3d 1118 (D.C. Cir. 1994)). Al Alwi attempts to meet this burden by arguing that the denial deprived him of adequate time to review the allegations in the government's factual return and undermined his ability to develop an effective attorney-client relationship. We conclude that Al Alwi has failed to demonstrate actual prejudice.

1. First, we agree with the government that, although the court denied Al Alwi's request for a continuance before filing a traverse, it effectively provided the same relief by granting his attorneys leave to file an amended traverse after they subsequently met with their client. As noted above, counsel's request had explained that they lacked sufficient opportunity to discuss the government's allegations due to Al Alwi's inability to meet on November 15, and they sought a thirty-day continuance so that they could instead meet with him on the next available date, December 5. *See* Pet'r Unopposed Mot. for Extension of Time at 5-6 (J.A. 796-97). After the continuance was denied and the traverse filed, counsel did meet with Al Alwi on both December 5 and 6. Thereafter, on December 12, counsel filed an amended traverse, the content of which the court considered at the habeas hearing on December 16-17. It is therefore hard to conclude that the appellant was prejudiced when he essentially obtained the relief he had sought.

On appeal, Al Alwi argues that the grant of leave to file an amended traverse was not sufficient because, when the district court initially advised counsel that they could seek leave to amend, the court instructed them that any amendment to the traverse "should be narrow and limited only to what has been learned as a result of your meeting with your client in the next few days," and that it should not "launch into a new line of

defense." Reply Br. 4 (quoting Status Hr'g Tr. 6 (Dec. 1, 2008) (J.A. 843)). After the court gave that instruction, however, Al Alwi's attorney explained his concern that the instruction was too restrictive, and the court clarified that it meant only that counsel should not "be coming in with a supplement that relates to things unrelated to your discussions with him." *Id.* (J.A. 846). And after counsel met with their client in December and filed the amended traverse, they neither renewed the motion for a continuance nor expressed concern that the court's instruction had caused them to leave anything out of the amended document.

2. Second, it is not completely accurate to suggest, as Al Alwi does, that without the continuance his counsel had less than six weeks to develop an attorney-client relationship and prepare a response to the charges against him. It is true that Al Alwi's counsel did not receive the government's factual return until October 22, 2008, and did not receive an unclassified version until November 5. But the vast majority of the allegations and evidence contained in that return had already been released in connection with Al Alwi's 2007 DTA appeal, in which he was represented by the same counsel who handled his habeas hearing.

Al Alwi's counsel, from the law firm of Clifford Chance, LLP, began representing him in 2005, when they first filed his habeas petition. They were not court-appointed, but rather were retained on Al Alwi's behalf by his cousin. In June 2007, counsel filed Al Alwi's appeal under the DTA, and on August 24, 2007, they received the unclassified version of the CSRT record. *See* Status Report, July 18, 2008 (J.A. 137). That record revealed most of the factual allegations upon which the district court ultimately based its detention decision, including the allegations that Al Alwi had traveled to Afghanistan to fight with the Taliban against the Northern Alliance, stayed in

specified Taliban guesthouses, trained and received weapons at the Khalid Center, and joined the Omar Sayef Center group in a middle line position in the fighting, where he witnessed "artillery attacks and saw other fighters die." Unclassified Summary of Basis for Tribunal Decision (J.A. 1069-71); Unclassified Summary of Evidence for CSRT (J.A. 1077-78). The CSRT record also disclosed that the government was principally relying on Al Alwi's own statements regarding his activities in Afghanistan. *See, e.g.*, Unclassified Summary of Basis for Tribunal Decision (J.A. 1069) (explaining that the "detainee . . . stated he traveled through Yemen to Pakistan and Afghanistan and joined the Taliban to fight against the Northern Alliance; received weapons training at the Khalid Center . . . ; stated that he was issued a weapon with ammunition and grenades while at the Khalid Center; that he was trained on the rocket-propelled grenade launcher; that he was assigned to the middle lines at the Omar Saif Center where he saw artillery attacks and other fighters die; that he fought on the front lines at Khvajeh Ghar, and that he was captured by Pakistani forces as he fled from Afghanistan to Pakistan crossing the border").

In August 2008, the government provided Al Alwi's counsel with the classified version of the CSRT materials. That record contained virtually all of the facts the district court ultimately found sufficient to justify his detention. It included several of Al Alwi's interrogation reports as well. Together, those reports provided virtually all of the content of Al Alwi's statements upon which the district court relied, including detailed accounts of: his journey to Afghanistan; his guesthouse stays; his turning over and failing to retrieve his passport at the Kandahar guesthouse; his training and arming at the Khalid Center; his military activities with the Omar Sayef Group; his belief that the group was led by al-Hadi; and his witnessing of U.S. aerial bombings while part of that combat unit. *See* CSRT Record: Criminal Investigative Task Force Report of

Investigative Activity, Interview of Muah Hamzah Ahmed Khader Al Alwi (Apr. 14, 2003) (J.A. 1084-86); CSRT Record: Memorandum for Record, Interview of Mu'az Hamza Ahmad (Al Alwi) (May 03, 2003) (J.A. 1113-20).

A protective order permitting attorney-client communication with respect to the CSRT materials was entered in September 2007. Thus, Al Alwi's counsel had approximately fourteen months to review the core allegations disclosed in the unclassified CSRT materials before the traverse was due on December 4, 2008. Al Alwi had four meetings with his attorneys during this time: on May 19, August 11, October 6, and November 14, 2008. *See* Decl. of James M. Hosking (Dec. 5, 2008) (J.A. 1230); Pet'r Unopposed Mot. for Extension of Time at 2-3 (J.A. 793-94). And, as noted above, he had two additional attorney-client meetings after he filed the traverse -- on December 5 and 6, 2008 -- which provided the basis for the amended traverse that he filed prior to his habeas hearing. *See* Decl. of Omar A. Farah (Dec. 12, 2008) (J.A. 1444).

Al Alwi correctly observes that the DTA/CSRT process was substantially more limited than habeas proceedings. The point about the CSRT materials, however, is not that they contained all that the detainee might say in response to the charges against him, but that (at least in this case) they contained virtually all of the charges the government made in the habeas proceeding. Al Alwi suggests this is not so, noting that the government's factual return in the habeas hearing ran to well over 400 pages, and arguing that the substantially shorter unclassified and classified versions of the CSRT materials therefore could not have sufficiently conveyed the government's allegations. It is true that the CSRT materials did not contain the government intelligence declarations that provided general information about al Qaeda and Taliban personnel, practices, and training camps. But those declarations did not contain accusations as to which

counsel needed to consult Al Alwi in order to respond; rather, counsel employed their own experts to counter those declarations. *See, e.g.*, Decl. of Arthur Brown (Oct. 13 2008) (J.A. 1271). As to the remainder of the additional materials, they largely consisted of interrogation reports of other detainees, relevant only to allegations that the district court did not reach -- such as Al Alwi's alleged role as one of Osama Bin Laden's bodyguards. *See, e.g.*, Gov't Factual Return Exhibit: FBI Interview Reports (J.A. 511-537); *see supra* note 3. Almost all of the allegations that the district court found sufficient to justify his detention were in the unclassified CSRT materials that Al Alwi's counsel received some fourteen months before his hearing.

3. Finally, we do not underestimate the difficulty that counsel have in developing rapport with clients detained at Guantanamo Bay. Nor do we doubt that more time spent with a client can improve case preparation.[9] But we must evaluate Al Alwi's claim of prejudice not in some theoretical sense, but in the context of the motion for a continuance that the district court actually denied on December 1, 2008. That motion did not mention any concern about the development of an effective attorney-client relationship. Although it did request more time for case preparation, it did not contend that substantially more time was needed -- only that thirty more days were required to successfully reschedule the attorney-client meeting that had been cut short by Al Alwi's hunger strike on November 15.

---

[9]Of course, detainee counsel must balance the need for more preparation time against their client's own interest in expedition. Indeed, Al Alwi's counsel opposed the government's request for a thirty-day continuance on the ground that "[e]very additional day that [he is] detained, and delayed in the[] opportunity to present challenges to [his] detention will only cause [him] further harm." Pet'r Opp'n to Resp't Mot. for Relief from Scheduling Order at 1 (J.A. 321).

Accordingly, the question before us is whether another thirty days -- not another six months or a year or longer -- would have affected the outcome of Al Alwi's habeas hearing. *Cf. United States v. Olano*, 507 U.S. 725, 734 (1993). Given the time Al Alwi's attorneys had after their receipt of the CSRT record, the district court's grant of leave to file an amended traverse, and the absence of any subsequent request for additional time or discovery,[10] we conclude that Al Alwi has failed to show that he was prejudiced by the denial of the thirty-day continuance. Indeed, even now -- with appellate counsel who is experienced in Guantanamo litigation, speaks Arabic, and "has also had more time with Petitioner" -- Al Alwi has only "begun to furnish the 'alternative [exculpatory] narrative' that the [district] court found absent in the proceedings below." Pet'r Br. 4. Whatever difficulty this may reflect, it does not suggest that the absence of that narrative in the district court proceedings was due to the denial of the thirty-day continuance.

B

Al Alwi's final argument is that the district court abused its discretion in its management of the discovery process.

1. Al Alwi contends, first, that "remand is required to determine whether the government produced relevant exculpatory evidence." Pet'r Br. 44. He does not argue that the government *did* fail to produce such evidence, only that it *may* have done so.

---

[10]In initially denying several of Al Alwi's requests for additional discovery, *see infra* Part III.B, the district court indicated that it would be open to renewed requests if Al Alwi's counsel developed justifications following their December meetings with him. *See* Status Hr'g Tr. 45, 76, 81 (Dec. 1, 2008) (J.A. 882, 913, 918).

The district court adopted a Case Management Order (CMO) that required the government to "provide on an ongoing basis any evidence contained in the material [it] reviewed in developing the return for the petitioner, and in preparation for the hearing for the petitioner, that tends materially to undermine the Government's theory as to the lawfulness of the petitioner's detention." CMO at 2, *Al Alwi v. Bush*, No. 05-2223 (D.D.C. Oct. 31, 2008) (J.A. 342). Al Alwi notes that, in *Bensayah v. Obama*, we subsequently interpreted the same CMO as requiring that any exculpatory "material reviewed in developing the return" must be disclosed, "even if the individual doing the filtering works for a Government agency other than the Department of Justice." 610 F.3d at 724. And he fears that the government did not comply with that understanding in this case: i.e., that it only produced exculpatory evidence that Justice Department attorneys saw in the course of preparing the government's return, but not evidence that employees of other agencies saw.

To justify his concern, Al Alwi cites what he regards as ambiguous remarks made by the district court and the government during the habeas proceedings. As Al Alwi observes, the court told the government that it was required to "produce any exculpatory evidence that *they* saw in the course of reviewing the documents that they reviewed to prepare the return," while the government responded that, "pursuant to [the CMO] *we* produced any and all information that may materially undermine" the government's case. Status Hr'g Tr. 31-32 (Dec. 1, 2008) (emphases added) (J.A. 868-69). However, "[n]owhere was it stated," Al Alwi points out, "whether 'they' or 'we' included *any* government agency employee, or solely the Department of Justice lawyers assigned to the case." Pet'r Br. 45.

If there was ambiguity in these statements, however, it was not because the court or the government failed to respond to Al Alwi's concerns, but because he did not express them as precisely as he does on appeal.  Al Alwi's counsel told the court, using the same pronoun to which his counsel now objects, that Al Alwi was entitled to all documents that would put the credibility of a witness in doubt, and that the government "cannot simply say that *we* didn't look at that."  Status Hr'g Tr. 62 (Dec. 1, 2008) (emphasis added) (J.A. 899).  The government attorney did not disagree.  "[L]et me make clear," he said, that "we have produced all evidence that we are aware of, that we became aware of in the process of our putting together this return, that may relate in any way to the credibility of a witness being in question."  *Id.* at 62-63 (J.A. 899-900).  It was not the case, he continued, that the government had turned a "willfully blind eye" to potentially exculpatory material.  *Id.* at 64 (J.A. 901).

It may be that this court's subsequent opinion in *Bensayah* has sharpened the nature of Al Alwi's argument.  But in *Bensayah*, we did no more than interpret the terms of the CMO in the course of rejecting a detainee's claim that the CMO was inconsistent with *Boumediene*.  *See Bensayah*, 610 F.3d at 724.  We did not suggest that the government had misunderstood those terms in that case, and there is no reason to believe that it did so in this one.  To the contrary, at oral argument, the government represented that, in both the *Bensayah* habeas proceeding and this one, the government had the same understanding of the CMO as that expressed in our *Bensayah* opinion.  Oral Arg. Tr. 33-35; *see id.* at 33 ("[W]hen we were reviewing information, every agency involved . . . in that process [was] instructed to provide exculpatory information that they [saw] as they [were] putting together the factual return.").  The government has reconfirmed this representation by post-argument letter.  *See* Letter from Sarang V. Damle, Dep't

of Justice, at 3 (Nov. 17, 2010) (stating that the government's discovery practice at the time of Al Alwi's habeas proceedings was "consistent with this Court's discussion of the case management order in *Bensayah*"). Accordingly, there is no warrant for a remand on this issue.

2. In addition to requiring the government to provide exculpatory information, the district court's CMO permitted the detainee to request additional discovery "for good cause shown." To obtain additional discovery, the request had to:

> (1) be narrowly tailored; (2) specify why the request is likely to produce evidence both relevant and material to the petitioner's case; (3) specify the nature of the request . . . ; and (4) explain why the burden on the Government to produce such evidence is neither unfairly disruptive nor unduly burdensome to the Government.

CMO at 2 (J.A. 342). Pursuant to this provision, Al Alwi filed a number of additional requests, all but one of which the district court denied. The court denied those requests on the ground that Al Alwi had failed to satisfy the four predicate conditions of the CMO. Al Alwi now contends that the denial constituted an abuse of discretion, principally on the ground that the court should not have required him to satisfy any burden before ordering production of several categories of information.

In *Boumediene*, the Supreme Court made clear that "[h]abeas corpus proceedings need not resemble a criminal trial." 553 U.S. at 783; *see Al-Adahi*, 613 F.3d at 1111 n.6; *Al-Bihani*, 590 F.3d at 876. Rather, the touchstone is that they must provide a "meaningful opportunity to demonstrate that [the detainee] is being held pursuant to 'the erroneous application or interpretation' of relevant law." *Boumediene*, 553 U.S. at 779

(quoting *INS v. St. Cyr*, 533 U.S. 289, 302 (2001)). In *Bensayah*, this court expressly held that the same CMO was consistent with *Boumediene*'s requirements, and that "the district court did not abuse its discretion in structuring discovery" so as to place the burden of establishing the CMO's predicates on the detainee. *Bensayah*, 610 F.3d at 724; *see also Al-Madhwani*, 2011 WL 2083932, at \*6 (affirming district court's denial of a detainee's additional discovery request because it "did not establish the conditions required under the CMO for further discovery").

Nor did the district court abuse its discretion in the manner in which it applied the CMO. The government represented that it had produced all evidence that it used in preparing its factual return and "that may inform the court with respect to the bases for his detention," Status Hr'g Tr. 16 (Dec. 1, 2008) (J.A. 853), and the court expressly required production of any and all statements by Al Alwi that the government had reviewed, *id.* at 43-44 (J.A. 880-81); *see id.* at 43 (J.A. 880) (holding that "it is material" if it "came out of his mouth[; t]hat's a ruling"). The court denied Al Alwi's additional requests only after first assuring itself that the government had already satisfied its obligation to produce any evidence "that tends materially to undermine the Government's theory as to the lawfulness of the petitioner's detention." CMO at 2 (J.A. 342); *see* Status Hr'g Tr. 31-33 (Dec. 1, 2008) (J.A. 868-70). The court also obtained specific representations from the government that, had there been any material evidence in the important categories of Al

Alwi's request,[11] the government would have produced it as part of that obligation, *see, e.g.*, *id.* at 62-63 (J.A. 899-900).[12]

In light of these circumstances, we find no abuse of discretion in the district court's refusal to issue further discovery orders without a showing that there was a basis for believing that the requests satisfied the CMO's predicate conditions.

IV

For the foregoing reasons, the district court's denial of Al Alwi's petition for a writ of habeas corpus is

*Affirmed.*

---

[11]As we have previously explained, evidence is "material" if "it is at least helpful to the petitioner's habeas case." *Al Odah*, 559 F.3d at 544; *see also Bensayah*, 610 F.3d at 724 ("Information that undermines the reliability of other materials, e.g., inculpatory evidence . . . , also tends 'materially to undermine the Government's theory as to the lawfulness of the petitioner's detention' and hence must be disclosed by the Government." (quoting the district court's CMO)).

[12]The government specifically denied that it had any evidence that Al Alwi had been mistreated while at Guantanamo Bay. Status Hr'g Tr. 63-64 (Dec. 1, 2008) (J.A. 900-01).